No. 61,955

STATE OF KANSAS, *Appellee,* v. GARY LEE HALL, *Appellant.*

(793 P.2d 737)

Opinion filed May 31, 1990.

*B. Kay Huff*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Gary Lee Hall*, appellant, was on the brief pro se.

*John Shirley*, county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: Gary Lee Hall appeals from his convictions of first-degree murder and two counts of theft.

The issues considered in the context of this criminal appeal are: (1) Was the information defective? (2) Did the trial court err in admitting evidence of Hall's prior crimes and bad character? (3) Did the trial court err in limiting cross-examination of the State's major witness (Hall's ex-wife)? (4) Did the trial court err in failing to instruct the jury on unlawful deprivation of property and in giving supplementary instructions on a question raised during deliberations? (5) Was defendant denied effective assistance of counsel? We have considered the defendant's pro se brief as well as the briefs filed by counsel for defendant and for the State.

We reverse Count II, the theft of cattle, because we find the State's failure to allege that Hall intended permanent deprivation resulted in the omission of an essential element of the crime from the information. We affirm all other issues. We also address in some detail, in the later portion of the opinion, the question of defective information claims and establish a new prospective rule for testing such claims when raised for the first time on appeal.

Facts

On February 4, 1984, Delbert Angleton was assigned to haul a load of cattle to Leoti, Kansas. He was driving a Kenworth tractor and an American Livestock trailer belonging to his employer, Star-Kan Truck Lines. A fellow truck driver encountered Angleton in the early morning hours of February 5, 1984, on Highway 54 approximately 25 miles west of Wichita. He and

Angleton spoke on the citizens' band (CB) radio. Angleton was going west. The usual route to Leoti was west from Wichita on Highway 54. Angleton did not arrive in Leoti on February 5, as had been anticipated.

Ten or twelve days later, the rig that Angleton had been driving was found in Cheyenne, Wyoming. A fellow employee was sent to pick it up. The employee suspected that someone other than Angleton had driven the truck because the clutch was "roughed up," the cab had been cleaned up, and the radio was set on a country western station. Angleton never listened to country western music; he enjoyed "acid rock." The trailer had been "dollied down" (unhooked from the truck) while it was still loaded, causing damage to the trailer. Cattle trailers are not built to withstand such treatment. It is unusual to dolly down a loaded cattle trailer.

Gary Lee "Blue" Hall, the defendant, had lived on a ranch in Oregon since 1979. Prior to purchasing the Oregon ranch, Hall had lived in Gove County, Kansas.

James Woodward was a neighbor of Hall's in Oregon. In 1982, Woodward's daughter Roberta began working for Hall. Hall's wife, Judy, left on a trip to visit relatives in Kansas. During the time Judy was gone, Hall began an affair with Roberta. Upon Judy's return, the Halls were divorced. Roberta moved into the ranch house, married Hall in the summer of 1983, and gave birth to a baby girl in August 1983. Roberta and Hall were divorced in 1985.

James Woodward testified that in February 1987 Roberta confessed to him that she and Hall had stolen a load of cattle in Kansas. Roberta told her father that Hall had killed the trucker hauling the cattle and buried him on the Oregon ranch. According to Woodward, Roberta begged her father not to go to the authorities because she said that Hall would kill her. Woodward subsequently contacted an attorney, who arranged a meeting for Woodward and Roberta with the Oregon authorities. Roberta was given immunity in exchange for her cooperation with the police.

### Roberta Woodward's Story

Roberta accompanied Hall on a trucking trip to Houston, Texas, in 1984. On their way to Texas, they stopped in Kansas and visited Hall's friends, the Yales.

Judy Yale testified that Roberta and Hall did visit them in Kansas sometime in 1984. Yale also testified that Roberta, during the visit, had given her a picture of Heather, Roberta's and Hall's daughter. Judy produced the photograph, which was inscribed on the back, "Heather Lee, seven and a half months, April 1984." Later testimony, however, indicated that Hall could not have visited the Yales in April 1984 because his truck had been confiscated in March 1984 and he did not purchase a new truck until August 1984.

The State produced documents indicating that Hall had unloaded apples in Houston, Texas, on January 31, 1984. Roberta identified Hall's signature on the bill of lading and her own handwriting on a document for Hall's broker. After unloading in Texas, Hall was unsuccessful in attempting to find a return load. They drifted around for a few days, following other trucks in the attempt to find a load.

On the evening of February 4, 1984, the two spent the night in the truck in Dodge City, Kansas. The next morning, Hall told Roberta that he had found a load (a cattle truck) that "looked good" and he was going to follow it.

After they passed Garden City, Hall asked Roberta to drive and to overtake the cattle truck. She began talking on the CB radio to the driver of the cattle truck, whose CB name was "Hangnail." Delbert Angleton's CB name was "Hangnail." Hall told Roberta to stop the other trucker. She asked Angleton if he would like to "smoke one" (meaning smoke some marijuana). Both trucks pulled into an abandoned refinery near Scott City, Kansas. Angleton joined Roberta in the cab of Hall's truck and smoked marijuana with her. Hall was in the sleeper and began acting like he was waking up. Roberta said that she saw a pistol come out from the sleeper and, as she turned her head away, two shots were fired. Angleton died immediately. Roberta suffered some loss of hearing due to the gun discharging so close to her head.

Hall pushed Angleton's body down in the seat and put a sleeping bag over it. Hall told Roberta that they had to get out of there. Hall drove the cattle truck, and Roberta followed him in Hall's truck. The two later stopped on a dirt road north of the Smoky Hill River and put Angleton's body in Hall's reefer trailer. They stopped for gas a couple of times and ended up at a truck

stop in Cheyenne, Wyoming. Hall removed the trailer from his tractor and hitched Angleton's cattle trailer on the back of Hall's tractor. Roberta covered the holes in Hall's trailer so that no one could see Angleton's body. That trailer and the truck which had pulled the cattle trailer were left at the truck stop, and Hall and Roberta headed for Oregon.

.As soon as they arrived back at the ranch in Oregon, Hall began unloading the cattle off Angleton's trailer. They spent the night at home, showered, and then drove back to Cheyenne. The trailers were switched again and they returned to Oregon, leaving the empty cattle truck/trailer at the truck stop. The next day, Hall called a neighbor and asked him to come dig a hole in which to bury some dead cows. The cattle were dumped in the hole. Hall then transported Angleton's body to the hole and dumped it in. Hall instructed Roberta to cover the body so that the neighbor would not see it when the hole was filled. Hall went down the road to make sure nobody came while Roberta shoveled dirt over the body.

## Hall's Story

Hall drove straight through from Oregon to Houston. He was drinking whiskey and taking amphetamines to stay awake. Roberta frequently smoked marijuana during the trip. After dropping off the load of apples in Houston, he attempted, during the next two days, to locate a return load either in Houston or Dallas, but was not successful. Roberta continued to smoke marijuana.

The couple drove to Oklahoma City, arriving in the early morning hours of February 3. Failing to find a return load in Oklahoma City, they headed toward Dodge City, Kansas. In Dodge City, Hall again checked for a load to haul to the Northwest. From Dodge City, the couple traveled to Oakley, where Hall saw an acquaintance who had secured a load out of Garden City. Hall had planned to visit his mother in Quinter, Kansas, but changed his plans when he and Roberta fought about the visit. They returned to Dodge City in the early morning hours of February 4.

They stayed at the Dodge City truck stop throughout the day on February 4, because Hall had information that he could have a load on Monday. According to Hall, he and Roberta had another

fight that evening. She wanted to go out and "party," but he would not go. That night, he slept in the driver's seat of the truck and Roberta slept in the sleeper.

At some point in the middle of the night, Roberta woke Hall and told him to follow her. She entered another truck, which then pulled out of the truck stop, going west. Hall testified that the other truck was a "bull wagon." He had no idea why his wife entered the other truck and wanted him to follow the truck. He followed the other truck through Garden City and north toward Scott City. Both trucks then stopped at an abandoned refinery, and Roberta, Hall, and "Hangnail" (Angleton) sat in Hall's truck and talked. Roberta told Angleton that Hall was thinking of hiring a driver, and Angleton said he was interested in working for him. Roberta then lit up some marijuana. Angleton admired Hall's truck, and Roberta asked Hall if he would let Angleton drive it.

When they left the refinery, Angleton was driving Hall's truck with Roberta as a passenger and Hall was driving Angleton's truck. They stopped again north of Scott City near a John Deere dealership. Angleton said that he wanted to visit with Hall. Hall rode with Angleton in Angleton's truck and Roberta followed in Hall's truck. They next stopped at the Gove/Orion road. During the drive, Angleton had asked Hall if Hall could pasture the cattle for him.

Roberta and Angleton were planning to take Angleton's load of cattle to Oregon, but Hall advised against it. As the three of them were standing and talking on the Orion road, a car passed by. Angleton and Roberta decided to go in Hall's truck so they could plan what they were going to do, and Hall followed in Angleton's truck. They next stopped at a truck stop in Goodland, Kansas. At this time, Hall told Angleton that Angleton could take Highway 27 south to Leoti and to forget all about the plan with Roberta, but Roberta told Hall to stay out of it. When they left the truck stop, Hall was driving Angleton's truck again and Angleton was driving Hall's truck.

They stopped one more time to transfer fuel from Hall's truck into Angleton's truck, then headed north toward the Nebraska state line. After that stop, Roberta was driving Hall's truck. Hall followed in Angleton's truck. Roberta moved way ahead of Hall and he didn't see them again for about 30 miles. The next time

Hall saw his truck, it was parked at a highway rest area in Nebraska. Hall drove on by because they had agreed to meet at a truck stop on the Wyoming/Nebraska border. When he arrived at the Wyoming truck stop, he went to sleep in the truck. Some time later, he was awakened by Roberta, who was crying and "high."

Hall went to his truck, opened the driver's door, and discovered Angleton's body on the passenger side covered with a sleeping bag. Hall became ill. When he asked Roberta what had happened, she said that she had done it for him and that it would not have happened if he had not left.

Roberta told Hall that, if he would take the cattle and cover up the killing, she would promise to give up drugs and be a better wife and mother. Hall said that he and Roberta had fought many times about her drug use. Hall then moved Angleton's body to the back of his reefer trailer and tried to clean up the cab of his truck. He said that Roberta had to help him move the body because he could not lift it by himself.

Hall's testimony as to what occurred later was substantially similar to Roberta's version of the facts. At the Cheyenne truck stop, they traded trailers and took the cattle to the Oregon ranch. Hall testified that, as they were driving from Cheyenne to Oregon, Roberta produced Angleton's wallet and gave him the money out of it.

Hall testified that he called a neighbor to dig the hole. He and Roberta took Angleton's body from the reefer trailer and put it in the trunk of their car. According to Hall, he made Roberta take the body to the hole and bury it by herself because, "It wasn't my deal. It made me sick to even be around it." After Roberta had disposed of the body in the hole and covered it with dirt, Hall and the neighbor dumped the dead cattle in the hole and filled it back in.

Both the State and the defense had stipulated that the body exhumed on the Hall ranch was the body of Delbert Angleton. On cross-examination of Hall, the State produced a transcript of Hall's original statement after his arrest. Several statements made by Hall at the time of his arrest conflicted with statements made at trial.

A witness testified that he was driving down the Gove/Orion road on the morning of Sunday, February 5, 1984. He said he saw two trucks parked on the road. One was a Kenworth cab-over with a cattle trailer and the other was a cab-over with a dry box. Angleton's truck was a Kenworth cab-over, but Hall's truck was a conventional, not a cab-over, and had a refrigeration unit, not a dry box. The witness testified that he remembered the incident because he used to drive a truck and although cattle trucks were common in the area, one rarely saw freight trucks. He also testified that it was unusual to see a "freight box" and a "bull wagon" traveling together. The witness saw two men standing by the trailer, and he thought he saw a third person step behind one of the trucks as he drove by. He was absolutely sure the two he saw were men. The witness' testimony was corroborated by a passenger in the witness' car.

A second passenger in the car testified that the two men were cleanshaven. Both Angleton and Hall had full beards in February 1984. None of the three passengers in the car saw the third person described by the driver. The four witnesses were in agreement that the two persons were definitely cleanshaven men and that both trucks were cab-overs.

The testimony of medical experts indicated that Angleton suffered two bullet wounds from an Amadio-Rossi .38 caliber revolver. Hall had previously owned such a revolver and had kept it in the sleeper of his truck for protection. Woodward testified that his daughter is a good shot. The testimony of the physician who performed the autopsy indicated that Angleton had been shot twice in rapid succession while sitting down and that the shots had been fired from behind and slightly above him.

The State called an acquaintance of Hall, who had accompanied him on long trips. The defense moved in limine to preclude any testimony by the acquaintance as to Hall's prior criminal activity. The court allowed both parties to question the acquaintance outside the presence of the jurors in order to make a determination of the admissibility of his testimony. The acquaintance testified to an incident in Georgia in which Hall followed another truck with the stated intention of killing the driver and stealing his truck. The acquaintance also testified as to an incident in which he, Hall, and another individual went to Nevada and stole a

truck. The truck which was stolen was the one that Hall was driving at the time of Angleton's murder and which was subsequently confiscated in Missouri as stolen.

The trial court ruled that the testimony as to the theft of the truck in Nevada was to be excluded as having no bearing on the case. The court did, however, allow testimony as to the incident in Georgia because the incident was illustrative of some sort of plan, intent, design, or organization. The defense requested that a limiting instruction be given to the jury at the time of the acquaintance's testimony. The trial court stated that such an instruction should be given at the close of all the evidence but that to give the instruction at the time of the testimony would call undue attention to that particular testimony.

The testimony of other witnesses will be described as necessary for a discussion of the issues raised in this appeal.

### Prior Crimes

Hall contends that the trial court erred in allowing testimony regarding the incident in Georgia. If the testimony was properly admitted, Hall claims the trial court should have given a contemporaneous limiting instruction at the time of the testimony. In addition, Hall argues that testimony regarding the fact that he was driving a stolen truck at the time of the crime and testimony indicating that he had stolen cattle in the past was unduly prejudicial and requires reversal.

K.S.A. 60-455 provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Keith Malaney, an acquaintance who was a fellow trucker, testified that he and Hall were driving from Atlanta, Georgia, to North Carolina to pick up a load in November 1983. At some point during the drive, a new model International truck passed them. According to Malaney, both he and Hall commented that it was an attractive truck. The driver of the new truck spoke on

the CB radio and told Hall and Malaney that he would like someone to drive for him for awhile so he could sleep as he had driven straight through from the West Coast.

According to Malaney, Hall wanted to "eliminate" the driver of the new truck and take the truck back to Oregon. Malaney testified that Hall attempted to catch up with the truck, but that Malaney wanted to stop and use the restroom. Hall argued about that but eventually stopped so that Malaney could relieve himself. After they had stopped, Malaney said that Hall drove at an excessive speed trying to catch up with the other truck. Malaney testified that Hall had a shotgun and a pistol in the truck.

The State moved to have the testimony at issue introduced pursuant to K.S.A. 60-455. Hall filed a motion in limine to preclude any testimony by Malaney as to Hall's prior criminal activity or actions. The defense did not renew its objection to the testimony at the time that Malaney testified before the jury. "When a motion in limine is denied, the moving party must object to the evidence at trial to preserve the issue on appeal." *Douglas v. Lombardino*, 236 Kan. 471, Syl. ¶ 2, 693 P.2d 1138 (1985).

"Admissibility of other crimes under 60-455 is to be determined by the trial judge prior to the trial and outside the presence of the jury. [Citation omitted.] In ruling on the admissibility of the proffered evidence, the trial court must: (1) determine it is relevant to prove one of the facts specified in the statute; (2) determine that fact is a disputed, material fact; and (3) balance the probative value of the prior conviction evidence against its tendency to prejudice the jury." *State v. Breazeale*, 238 Kan. 714, 719, 714 P.2d 1356, *cert. denied* 479 U.S. 846 (1986).

In *Breazeale*, the defendant had been convicted of similar crimes in Colorado. It should be noted, however, that K.S.A. 60-455 does not require that the defendant be convicted of the crime or civil wrong at issue. The State contends that the testimony regarding the incident in Georgia was relevant to prove that Hall had a plan to kill a truck driver and steal his load. This was a disputed, material fact, as Roberta testified that Hall was driving around Kansas with such a plan in mind, whereas Hall asserted that he was driving around attempting to find a legal load to haul back to the Northwest.

Both parties cite *State v. Marquez*, 222 Kan. 441, 446-47, 565 P.2d 245 (1977):

"Plan refers to an antecedent mental condition that points to the doing of the offense or offenses planned. The purpose in showing a common scheme or plan is to establish, circumstantially, the commission of the act charged and the intent with which it was committed. Strictly speaking, the exception is limited to evidence which shows some causal connection between the two offenses, so that proof of the prior offense could be said to evidence a preexisting design, plan or scheme directed toward the doing of the offense charged."

Roberta testified that Hall spotted Angleton's truck and instructed her to follow it; that Hall told her to engage Angleton in conversation on the CB radio and to get him to pull over somehow. Malaney testified that Hall spotted the International truck, began following it, and talked to the driver on the CB. The opportunity to have the driver pull over presented itself when the driver said that he would like someone to drive for him for awhile. The incident in Georgia, therefore, appeared to be relevant to the issue of plan. See Slough, *Other Vices, Other Crimes: Kansas Statutes Annotated Section 60-455 Revisited*, 26 Kan. L. Rev. 161, 165 (1978).

The trial court did not abuse its discretion in determining that testimony regarding the incident in Georgia was admissible for the purpose of showing a plan on the part of Hall. See *Hoffman v. Haug*, 242 Kan. 867, 873, 752 P.2d 124 (1988).

### The Limiting Instruction

Hall contends that the court erred in not giving the limiting instruction contemporaneously with Malaney's testimony. The court did give a limiting instruction in accordance with PIK Crim. 2d 52.06 at the close of the trial. PIK Crim. 2d 52.06 was approved by this court in *State v. Williams*, 234 Kan. 233, Syl. ¶ 2, 670 P.2d 1348 (1983). The *Williams* opinion did not specify whether the instruction was given contemporaneously or at the close of all the evidence.

Hall cites two cases in which a limiting instruction was given contemporaneously with the K.S.A. 60-455 evidence. *State v. Clements*, 241 Kan. 77, 85, 734 P.2d 1096 (1987); *State v. Gourley*, 224 Kan. 167, 169, 578 P.2d 713 (1978). Neither of these cases, however, mandates that the instruction is to be given contemporaneously. Although there are numerous cases construing K.S.A. 60-455, we have not adopted a rule that a limiting

instruction must be given contemporaneously with the evidence at issue. The comments to PIK Crim. 2d 52.06 are silent as to this issue.

In *State v. Morris*, 244 Kan. 22, 23, 765 P.2d 1120 (1988), we stated:

"Jury instructions are to be considered together and read as a whole, without isolating any one instruction. [Citation omitted.] If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous."

We believe the timing of any limiting instruction is best left to the discretion of the trial court.

### The Other Crimes

Hall contends that the trial court erred in allowing the State to elicit testimony that Hall was driving a stolen truck and that Hall had stolen cattle from his neighbors.

In the State's case in chief, Roberta testified that she and Hall had stopped to visit the Yales on the way to Houston in January 1984. The defense attempted to erode Roberta's credibility by showing that the visit to the Yales occurred in April 1984, not January. Loren Porter testified that it would have been impossible for Hall to have visited the Yales in Hall's truck in April because the truck had been confiscated as stolen in March 1984. This testimony was given the second time Porter testified and, at that time, the defense did not object to the testimony.

Porter, however, had previously testified that in March 1984 he was hauling a load for Hall when Porter was stopped in Oak Grove, Missouri. Hall's truck was confiscated as stolen. This testimony was heard after Judy Yale had testified regarding the photograph of Hall's daughter with the April 1984 date. At that time, the defense strongly objected to the line of questioning. The court ruled:

"Well, I'm going to find at this time that there is no evidence that it's even trying to come in under 60-455. That this witness is testifying as to his relationship with that truck, and his relationship with Mr. Hall as an employer. And, at this time that that's proper over the objection of the [defendant]. And, I'm going to call the jury back in and permit Mr. Porter to testify."

The State also presented a Missouri state trooper as a rebuttal witness. The trooper testified that on March 14, 1984, he was dispatched to a weigh station to investigate a stolen truck. The trooper identified the driver as Porter. At no time did the trooper testify that Hall actually stole the truck, merely that the truck was confiscated as stolen. Hall later testified that Porter called him from Missouri and told him that at least one other truck had been detained in Missouri and that Hall was never summoned to Missouri on the matter.

Hall contends that the admission of this testimony violated the rules set forth in *State v. Bly*, 215 Kan. 168, 523 P.2d 397 (1974). *Bly*, however, was a case interpreting K.S.A. 60-455. The trial court in Hall's case specifically stated that the testimony was not coming in under K.S.A. 60-455. Hall opened the door to the testimony regarding confiscation of the truck by attempting to impeach Roberta's testimony that they had visited the Yales on the same trip in which Angleton was killed. Rebuttal evidence is that which contradicts evidence introduced by an opposing party. It may be offered to corroborate evidence of a party who first presented evidence on the particular issue, or it may refute or deny some affirmative fact which an opposing party has attempted to prove. *State v. Weigel*, 228 Kan. 194, Syl. ¶ 9, 612 P.2d 636 (1980).

Hall next asserts that the admission of testimony that he had stolen cattle from his neighbors was highly prejudicial and erroneous. The State contends that Hall opened the door to this line of questioning.

Hall called his sister, Denise, to testify on his behalf. Denise testified as to the good relationship Hall had with his daughter. Denise testified that, shortly after Christmas 1985, Hall had a blind heifer which he took to Roberta's house for Roberta to take care of. The heifer was intended as a gift to Hall's daughter, Heather. The defense also recalled Roberta as a defense witness and elicited testimony from her regarding the gift of the blind heifer. Defense counsel asked Roberta if the blind heifer was one of the ones from Angleton's truck. On cross-examination, the State elicited Roberta's story of "at least five" other cattle that Hall had "gathered up" from the neighbor and said he would give to

Heather; however, Hall sold them. "When the defendant opens a subject on direct or cross-examination, the State may develop and explore various phases of that subject." *State v. Chatmon*, 234 Kan. 197, 203, 671 P.2d 531 (1983).

Defense counsel made no objection to the testimony concerning the "gathered up" cattle.

### Hall's Bad Character

Hall testified at length concerning his background, education, employment, family, marriages, and his ranching operations. He testified that: (1) his brother is a former sheriff of Gove County, Kansas; (2) his mother, grandmother, aunt, uncle, brother, and sister were all present at the trial; (3) his mother hand-makes all his shirts; and (4) his ranch was a profitable operation of a certain size with a certain number of cattle. We agree with the State's contention that Hall went beyond basic biographical information. He attempted to portray himself as a good Kansas farm boy, a family man, and a successful rancher.

We interpreted K.S.A. 60-447(b) in *State v. Stokes*, 215 Kan. 5, 7, 523 P.2d 364 (1974). We recognized that, where the accused testifies on his or her own behalf, the biographical data will naturally be more extensive than that of an ordinary witness. We stated:

"He is entitled, like any other witness, to let the jury know who he is so that it may properly fit him into the pattern of events brought out at the trial. Of course, when the testimony of either the defendant or any other witness for the defense goes beyond those bounds and attempts to characterize the defendant's past life as blemish-free, or makes reference to specific prior incidents, he foregoes to that extent the protection of the statute." 215 Kan. at 7.

Hall specifically objects to evidence presented by the State that his first wife had an abortion prior to their marriage and that she divorced him out of fear because he shot her dog and beat a cow to death. Although the testimony about the abortion is prejudicial and not relevant to the issues in this case, it should be noted that the defense did not object to this question. The defense did object when the State asked Hall if his first wife was pregnant at the time of their marriage. The court overruled the objection when the State pointed out that defense counsel had spent several hours going over Hall's background. The defense also did not

object to the cross-examination of Hall regarding the beating of cattle and the shooting of his first wife's dog. Hall admitted that his first wife left him, partly because he shot her dog with a .44 magnum pistol.

## Cross-Examination of the State's Major Witness

Hall next contends that the trial court erred in limiting the testimony regarding Roberta's drug use. Hall asserts that this information was vital for the purposes of impeaching Roberta's credibility, establishing a motive on her part for the theft and murder, and establishing a motive for Hall to conceal the crime. The State had moved in limine to prohibit the defense from inquiring into Roberta's drug use or any indebtedness she had to any drug dealers. The trial court ruled:

"[U]nless inquired into by plaintiff, the use, sale, possession, consumption of illegal drugs by Roberta Woodward shall not be the subject of cross examination by defendant. Defendant is prohibited from cross examining Roberta Woodward about her use, possession or consumption of marijuana and other illegal substance except as to matters disclosed by the plaintiff's direct examination. This order in no way limits or restrains defendant's right to call Roberta Woodward as a defense witness and examine her accordingly as to any matter providing the matter is within the Kansas Rules of Evidence as provided in K.S.A. 60-401 et seq."

### A. Credibility

It has long been the rule in this state that drug offenses are not crimes involving dishonesty and, therefore, cannot be admitted for the purpose of impeaching the credibility of a witness. *State v. Crowley*, 220 Kan. 532, 552 P.2d 971 (1976). During direct examination, Roberta testified that she had smoked marijuana with Angleton prior to the murder. On cross-examination, the defense questioned her at length concerning the use of marijuana. Hall was permitted to testify that Roberta smoked marijuana frequently on the haul to Houston and that she purchased more marijuana in Denton, Texas. The jury was therefore able to consider Roberta's marijuana use at the time of the crime charged in determining the reliability of her testimony and the accuracy of her memory.

### B. Motive

The defense sought to admit evidence that Roberta had a past history of heavy drug use and that Hall had agreed to help her

conceal the crime because she promised to give up drugs. The defense also sought to admit evidence as to an incident that occurred subsequent to Angleton's murder in which Roberta allegedly attempted to injure or kill Hall while she was on drugs. The trial court stated:

"Unless you can show at the time that this alleged crime occurred that some form of drug use either by the defendant or by [Roberta] Woodward directly attributed to this crime occurring you're not going to impeach her credibility as a witness solely upon her prior drug abuse. And, my order and the motion in limine stands. Your proffer is duly noted for the record. You can certainly inquire as to her drug abuse if you can tie it into this time frame and how it affected this crime on the days and times in question as I so ruled."

Hall was permitted to testify that Roberta was "high" at the time of Angleton's death. He also testified that he said to her, "See what your drugs have got you into now?" He testified that Roberta told him if he helped her conceal the murder, she would quit using drugs. Hall said that her drug use had been a big issue in their marriage. Hall testified that, after they had buried the body, they continued to argue because Roberta did not stop her drug use. At that point of the trial, the State objected and the jury was excused during a discussion between the court and counsel. The court held that Roberta's drug use subsequent to the crime charged was too far removed in time to have any probative value.

The court, however, did allow some testimony regarding an incident in which Hall was either pushed or jumped from a moving vehicle which Roberta was driving while she was "high."

*State v. Ralph*, 217 Kan. 457, 537 P.2d 200 (1975), involved an armed robbery of a drugstore in which a large quantity of narcotics was taken. We held that: (1) evidence that the defendant was a narcotics addict was admissible to show motive as only narcotics were taken, not money; and (2) narcotics addiction is not a character trait pursuant to K.S.A. 60-447 and may be shown *where relevant* regardless of whether the defendant has put his character in issue.

As the State points out in its brief, no evidence of Roberta's good character was presented. The defense was able to present testimony by both Hall and Roberta herself that indicated she

had a drug problem. The defense made no proffer of evidence of Roberta's alleged debts to drug dealers, which was her alleged motive for murdering Angleton. See K.S.A. 60-405. The trial court did not err in limiting the evidence of Roberta's drug use.

### Defects in the Complaint

### A. The Theft of Cattle Charge

Hall contends that his conviction for count II was void because the complaint failed to allege that he took control of the cattle with the intent to *permanently* deprive the owner of their possession.

Hall was convicted under K.S.A. 1984 Supp. 21-3701, which states in part: "Theft is any of the following acts done with intent to deprive the owner permanently of the possession, use or benefit of the owner's property." Hall contends that the intent to *permanently* deprive the owner of possession is an essential element of theft and, therefore, the complaint was insufficient as to count II. It should be noted that count III, which contained the charge for the theft of the truck and cattle trailer, did allege the intent to permanently deprive the owner. Count II, regarding the theft of the cattle, failed to allege that the intent was to *permanently* deprive, but it did state that the defendant was being charged pursuant to K.S.A. 21-3701, a class E felony. We have held that the citation to the statute cannot substitute to supply a missing element of the charge, and that incorporations by reference cannot be implied and will not be inferred but must be explicit. *State v. Jackson,* 239 Kan. 463, 466, 721 P.2d 232 (1986). Count II stated:

"[Gary Lee Hall did] unlawfully, feloniously, and willfully obtain or exert unauthorized control over property; to wit: 75 head of yearling steers and with the intention to deprive the owner, to wit: Russell McKee, and/or Randy Beggs, of the possession, use, or benefit of said property of a value of more than One Hundred Fifty Dollars ($150.00) in violation of K.S.A. 21-3701, a Class E Felony."

There was no K.S.A. 22-3201 incorporation by reference between Counts II and III. Under our reasoning in *Jackson* the inclusion of "to permanently deprive" in Count III does not cure its omission in Count II. *Jackson,* 239 Kan. at 466.

The jury was properly instructed on Count II. The instruction on the theft of the cattle included the element of permanency. We have also held, however, that a proper instruction does not remedy the defect. *State v. Howell & Taylor*, 226 Kan. 511, 513, 601 P.2d 1141 (1979). Under our past holdings the intent to permanently deprive the owner of possession is an essential element of the crime of theft and, therefore, Count II of the information did not sufficiently charge the offense of theft. See *State v. Browning*, 245 Kan. 26, 774 P.2d 935 (1989) (malice is an essential element of second-degree murder). There can be little doubt of what the State intended to charge in Count II. The theft statute was specifically mentioned. However, we have held that an information which omits one or more of the essential elements of the crime it attempts to charge is jurisdictionally and fatally defective and a conviction on that offense must be reversed. *State v. Wilson*, 240 Kan. 606, 607, 731 P.2d 306 (1987). The information does not charge theft in Count II. Our past precedent requires a reversal as to Count II.

### B. The Felony-Murder Charge

Count I of the information read as follows:

"[Gary Lee Hall did] unlawfully, feloniously, willfully, and maliciously, deliberately and with premeditation, kill and murder a certain human being, to wit: Delbert W. Angleton, by shooting the said Delbert W. Angleton with a 38 caliber hand gun, or that the said Delbert W. Angleton was killed while the said Gary Lee Hall perpetrated or attempted to perpetrate a felony crime to wit: the theft of cattle and a cattle truck, all in violation of K.S.A. 21-3401, a Class A Felony."

Hall contends that Count I is defective because it fails to specify a felony that is inherently dangerous to human life and to specify the essential elements of the underlying felony. The issue of whether theft can be the basis for felony murder was discussed in *State v. Lashley*, 233 Kan. 620, 664 P.2d 1358 (1983). The question is whether theft is a felony which is "inherently dangerous to human life."

Because the complaint did not specify under which section of 21-3701 Hall was charged, he contends that it did not charge an underlying felony that was inherently dangerous to human life.

In *Lashley*, the defendant's conviction of felony murder was affirmed. The evidence was that the defendant took the victim

to a remote wooded area and shot him. Lashley's first-degree felony-murder charge was based upon the theft of property belonging to the deceased Robbins. The court held: "Theft by obtaining or exerting unauthorized control over property, K.S.A. 21-3701(a), and obtaining by threat control over property, K.S.A. 21-3701(c), when considered in the abstract, are felonies inherently dangerous to human life and will sustain a conviction for murder in the first degree under the felony murder rule." *State v. Lashley*, 233 Kan. 620, Syl. ¶ 12.

In *State v. Foy*, 224 Kan. 558, 582 P.2d 281 (1978), the defendant was charged in the information with first-degree premeditated murder. The evidence at trial established that the victim had been shot when the defendant went looking for her and entered the victim's mother's house without permission. Although the defendant was charged with first-degree premeditated murder, the trial court also instructed the jury on felony murder, using aggravated burglary as the underlying felony. The defendant had not been charged with aggravated burglary. This court stated:

"Our court has held an information in the ordinary form charging that a killing was done with malice aforethought, deliberation and premeditation is sufficient to sustain a conviction of murder in the first degree committed in the perpetration of a robbery or burglary. [Citation omitted.] Therefore, the fact that felony murder was not charged in the information does not preclude an instruction where evidence supports the instruction." 224 Kan. at 566.

The same issue was raised in *State v. Murdock*, 236 Kan. 146, 154, 689 P.2d 814 (1984). The defendant was charged with premeditated murder in the information but the evidence at trial indicated that the victim's apartment was broken into and she was raped, strangled, and robbed. The trial court gave an instruction on felony murder.

In Hall's case, the jury was instructed on both premeditated murder and felony murder. Hall does not contend that the information was insufficient as to the charge of premeditated murder.

The offense of felony theft by obtaining unauthorized control over the property of another, as set forth in the court's instructions, is a felony, when viewed in the abstract, inherently dan-

gerous to human life, and is a proper felony to sustain a conviction for murder in the first-degree under the felony-murder rule.

We have previously ruled that a defendant need not be charged with or convicted of the underlying felony in order to be convicted of felony murder. *State v. Wise*, 237 Kan. 117, 122, 697 P.2d 1295 (1985). Hall appears to think that it was necessary for the State to include every element of the underlying felony in order to sufficiently charge felony murder in the information. Count I clearly stated that the felony murder was done in the perpetration of the theft of cattle and a cattle truck. Read in conjunction with Count III, there could be no doubt as to which theft the State referred. Under the *Foy* rule, the State did not even have to charge Hall with felony murder or theft as long as it charged him with premeditated murder. Under the *Wise* rule, the State did not have to charge Hall with theft to sustain the felony-murder conviction.

### Unlawful Deprivation of Property

Hall next contends that the trial court erred in failing to instruct on the lesser included offense of unlawful deprivation of property as to count III, the theft of the truck and cattle trailer. Although defense counsel did request instructions on lesser included offenses of first-degree murder, he did not request any instructions on lesser included offenses of theft. Unlawful deprivation of property is a lesser included offense of theft.

K.S.A. 21-3107(3) states:

"In cases where the crime charged may include some lesser crime, it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced."

Hall contends that, because he did not keep Angleton's truck but abandoned it in Wyoming, he had no intent to permanently deprive Angleton of the truck. According to Hall's testimony, he was driving Angleton's truck with Angleton's permission up until Angleton's death. Upon discovering Angleton's death, Hall immediately abandoned the truck and only used the trailer for a couple of days to haul the cattle. According to Roberta, Hall killed Angleton with the intent to take his load of cattle. Roberta's testimony indicated that Hall only used the truck and cattle trailer

as needed to haul the cattle, then he abandoned them in Wyoming.

"The trial court has an affirmative duty to instruct on all lesser included offenses supported by the evidence. [Citations omitted.] Evidence supporting such an instruction must be considered in the light most favorable to the defendant. [Citation omitted.] The evidence need not be strong evidence—indeed, it may be weak and based only on the testimony of the defendant. [Citations omitted.] The test is whether the evidence might reasonably cause a jury to convict the defendant of the lesser charge. [Citation omitted.]" *State v. Colbert*, 244 Kan. 422, 427-28, 769 P.2d 1168 (1989).

In *State v. Keeler*, 238 Kan. 356, 710 P.2d 1279 (1985), the defendant was convicted of stealing an automobile. The evidence indicated that the defendant attempted to hire a taxi to take him to a girlfriend's house and that, when he could not book a taxi, he took the victim's car. The car was found about a week later approximately two blocks from the defendant's residence. The defendant argued that the evidence did not show an intent to permanently deprive the victim of the automobile but merely the "borrowing" of the car to visit his girlfriend and then go home. We noted that there was nothing to indicate the defendant intended to return the automobile at the time it was appropriated, and, during the several days before it was recovered, defendant made no effort to return the automobile or to alert the owners as to its whereabouts.

Keeler argued that it was error not to instruct the jury on the lesser offense of unlawful deprivation of property. The court held:

"It is well-settled in Kansas that the duty to instruct on lesser crimes arises only when there is evidence upon which a defendant might reasonably be convicted of the lesser crime. [Citation omitted.] Keeler took the stand and denied any involvement in the theft of the Sippels' Toyota. The only version of the offense presented at trial was that offered by the State. Nothing is contained in the record to indicate any evidence was produced to show the defendant intended to restore the Toyota to its owner. Under the theories presented at trial Keeler was either guilty of theft or not guilty." 238 Kan. at 365-66.

In the case at bar, Hall did not deny having taken the truck and trailer. He contends, however, that he did not intend to take the truck permanently. There was no evidence presented to indicate that Hall attempted to restore the truck to its owner.

Randall Beggs testified that the truck and trailer were recovered in Wyoming ten to twelve days after Angleton's disappearance.

In *State v. Warren*, 221 Kan. 10, 557 P.2d 1248 (1976), the defendant had escaped from custody at the Salina Police Head-quarters, where he had been brought in on a drug-related charge. The evidence indicated that the defendant had taken a flat-bed truck from a local lumber company to effect his escape. The truck was later abandoned at a motel in WaKeeney. This court held that it was not error for the trial court to fail to instruct on unlawful deprivation of property. "In the record presented, there is no evidence of any intent of defendant to restore the truck to its owner." 221 Kan. at 13.

K.S.A. 21-3110(6) defines to "deprive permanently" as to:

"(a) Take from the owner the possession, use or benefit of his or her property, *without an intent to restore the same*; or

"(b) Retain property *without intent to restore the same* or with intent to restore it to the owner only if the owner purchases or leases it back, or pays a reward or other compensation for its return." (Emphasis added.)

The Kansas theft statutes were discussed and analyzed in Wilson, *Thou Shalt Not Steal: Ruminations on the New Kansas Theft Law*, 20 Kan. L. Rev. 385, 409-10 (1972). Failure to give the instruction on unlawful deprivation was not error.

### Supplementary Instructions: Jury Deliberations

Hall contends that the trial court should have given supplementary instructions to the jury.

During deliberations, the jury sent the following note to the trial court: "Point three, if Randy Beggs's truck was stolen for purpose of transporting stolen cattle and returned to a point unknown to Randy Beggs does this constitute theft of property?" The note referred to instruction number four, point three, which referred to Count III of the complaint: "That the defendant intended to deprive Randy Beggs, d/b/a Star-Kan Trucking, permanently of the use or benefit of the property." The trial court asked counsel for comments or suggestions regarding the jury's question. Defense counsel replied that he thought it best to instruct the jury to read all the instructions and not to pick out particular points. The State commented, "[T]he intent to permanently deprive is a question of fact to be determined by the

jury from the evidence that it has heard." Defense counsel replied that he did not think any one issue of fact should be singled out.

The court said: "Counsel, I would forward the following written response to the jury dated at 11-4-87, 5:30 p.m. 'Members of the jury, it is for you to determine all issues of fact based upon the evidence and the law as given in these instructions. Signed J. Stephen Nyswonger. District Judge.' "

The court's response to the jury's question is not an abuse of discretion, as both counsel agreed to such response. Hall contends that the jury's note indicates that the jury may have convicted Hall on the lesser charge of temporary deprivation had the court instructed it on such offense.

There must be some evidence to support a finding that the defendant intended to restore the property to its owner. Here, the property was abandoned hundreds of miles away, in another state. In *Keeler*, we held that there was no evidence of intent to restore where the property had been abandoned within the same city. 238 Kan. at 366. In *Warren*, the property had been abandoned 120 miles away from its original location. 221 Kan. at 11.

## Effective Assistance of Counsel

Hall's final contention is that he was deprived of effective assistance of counsel. He contends that his defense counsel had evidence that would make Hall's testimony more plausible as it indicated that Angleton had a motive to steal his own load and that Angleton was involved in other illegal undertakings.

Defense counsel called two friends of Angleton's, as well as Angleton's mother, and attempted to elicit testimony that Angleton's marriage was in trouble and that he was deeply in debt. This line of questioning was generally unsuccessful. The testimony indicated that Angleton had the same type of financial and marital problems that any average person might have. Russell McKee testified that Angleton had been hauling loads of his cattle for four or five years, with an estimated total of 700 loads. McKee said that he saw Angleton and his wife together shortly before Angleton left with the final load and that they had spent the night together at a motel prior to Angleton's departure and seemed to be on good terms.

Hall admits that he has raised this issue for the first time on appeal. In *State v. Van Cleave*, 239 Kan. 117, Syl. ¶ 1, 716 P.2d 580 (1986), this court held: "In an appeal from conviction of a crime, the allegation that the defendant did not have effective assistance of counsel will not be considered for the first time on appeal."

### Allegations of a Defective Information
### Raised for the First Time on Appeal

We take this opportunity to express our concern relating to the number of appeals in Kansas in which the allegation of a defect in the information is raised for the first time on appeal. Our reference to "information" also includes "complaint" or "indictment," as the pertinent Kansas statutes use the phrase "the complaint, information, or indictment."

Initially, we address what appears to be the practice of drawing an information without having at hand the current statute defining the offense. If the statutory definition of the crime is present and utilized as the information is being drawn, it is unlikely that an essential allegation or element of the crime will be omitted. The frequency with which this court and the Court of Appeals are required to consider questions of claimed defects in informations suggests that certain prosecutors need to exercise more care in the initial preparation of the charging document.

We now turn to the explanation of our views with reference to claims of a defective information raised by the defendant for the first time on appeal.

The Bill of Rights in the Kansas Constitution requires that the accused be allowed to demand the nature and cause of the accusation. Kan. Const. Bill of Rights, § 10. A defendant cannot be charged in the information with one offense and be convicted of another and different offense which is not a lesser included offense of the crime charged when instructed upon pursuant to statute. *State v. Chatmon*, 234 Kan. 197, 205, 671 P.2d 531 (1983). The § 10 language is similar to the language of the Sixth Amendment to the United States Constitution, which extends to an accused the right "to be informed of the nature and cause of the accusation." *State v. Loudermilk*, 221 Kan. 157, 159, 557 P.2d 1229 (1976).

The constitutional protections referred to are implemented by the requirements of K.S.A. 22-3201. The complaint, information, or indictment shall be a plain and concise written statement of the essential facts constituting the crime charged and, when drawn in the language of the statute, shall be deemed sufficient. An information is sufficient if it clearly informs the defendant of the precise offense of which he or she is accused so that the accused may prepare a defense and so that a judgment thereon will safeguard the accused from a subsequent prosecution for the same offense. 1 Wright, Federal Practice and Procedure: Crim. 2d § 125 (1982). It has long been the rule that the entire record of the proceedings, and not the indictment or information alone, may be referred to if there is a claim that a subsequent prosecution constitutes double jeopardy. 1 Wright, Federal Practice and Procedure: Crim. 2d § 125. We agree with the statement in 1 Wright, Federal Practice and Procedure: Crim. 2d § 125 at 365, to the effect that the fundamental purpose of the pleading is to inform the defendant of the charge so that the defendant may prepare a defense. The test for sufficiency ought to be whether it is fair to require the defendant to defend on the basis of the charge as stated in the particular indictment or information. The stated requirement that every ingredient or essential element of the offense should be alleged must be read in the light of the fairness test just mentioned. The information is sufficient, even if an essential averment is faulty in form, if by a fair construction it may be found within the text. All parts of the pleading must be looked to in determining its sufficiency. 1 Wright, Federal Practice and Procedure: Crim. 2d § 125 at 367.

Common sense will be a better guide than arbitrary and artificial rules. The sufficiency of an information should be determined on the basis of practical rather than technical considerations when addressed for the first time on appeal. *State v. Wade,* 244 Kan. 136, 766 P.2d 811 (1988); *State v. Micheaux,* 242 Kan. 192, 747 P.2d 784 (1987); 1 Wright, Federal Practice and Procedure: Crim. 2d § 125 at 385.

In 1963, the Kansas Judicial Council established an Advisory Committee on Criminal Law Revision. The committee was given responsibility for studying and evaluating the substantive and procedural criminal law of the state and for recommending ap-

propriate revisions of ch. 21 and ch. 62 of the Kansas Statutes Annotated. The proposal of the committee with some modification was enacted into law, L. 1969, ch. 180, and became effective on July 1, 1970. Wherever feasible, federal statutes and federal rules of criminal procedure were followed. *Kansas Code of Criminal Procedure,* Kansas Jud. Council Bull. at 11 (October 1969).

K.S.A. 22-3502, Arrest of judgment, patterned after Fed. R. Crim. Proc. 34, was incorporated into the 1970 criminal code revision. A motion in arrest of judgment had been part of our criminal procedure since 1868. G.S. 1949, 62-1605. We reviewed the history of the motion in *State v. Crozier,* 225 Kan. 120, 123, 587 P.2d 331 (1978). Our statute prior to the enactment of K.S.A. 22-3502 contained no time limit. The current statute requires the defendant to file such a motion "within 10 days after the verdict or finding of guilty."

"The court on motion of a defendant shall arrest judgment if the complaint, information or indictment *does not charge a crime or if the court was without jurisdiction of the crime charged.* The motion for arrest of judgment shall be made within 10 days after the verdict or finding of guilty, or after a plea of guilty or *nolo contendere,* or within such further time as the court may fix during the 10-day period." (Emphasis added.) K.S.A. 22-3502.

In addition to the G.S. 1949, 62-1605 motion in arrest of judgment, prior to the criminal code revisions of 1970, the trial court was given authority by statute (G.S. 1949, 62-1606) to arrest judgment on its own motion for "any of these defects," "these defects" referring to the grounds for the motion to arrest judgment: "*First,* that the grand jury who found the indictment had no legal authority to inquire into the offense charged, by reason of it not being within the jurisdiction of the court; *second,* that the facts stated do not constitute a public offense." G.S. 1949, 62-1605.

The statutory authority extended to the court by G.S. 1949, 62-1606 is not found in the federal rules. The authority has been carried forward in our present criminal code at K.S.A. 22-3503, Arrest of judgment without motion: "Whenever the court becomes aware of the existence of grounds which would require that a motion for arrest of judgment be sustained, if filed, the court may arrest the judgment without motion."

The legislature also adopted the counterpart of Fed. R. Crim. Proc. 12, with modifications:

"(3) Defenses and objections based on defects in the institution of the prosecution or in the complaint, information or indictment other than that it fails to show jurisdiction in the court or to charge a crime may be raised only by motion before trial. The motion shall include all such defenses and objections then available to the defendant. Failure to present any such defense or objection as herein provided constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver. *Lack of jurisdiction or the failure of the complaint, information or indictment to charge a crime shall be noticed by the court at any time during the pendency of the proceeding.*" (Emphasis added.) K.S.A. 1989 Supp. 22-3208.

The framing of the information is outlined by K.S.A. 22-3201(2). Defects in the institution of the prosecution or in the information, other than jurisdiction or the charging of a crime, are waived if not raised by motion prior to trial. *State v. Smith,* 209 Kan. 664, 665, 498 P.2d. 78 (1972); K.S.A. 1989 Supp. 22-3208(3).

A defendant has the right to file a written motion for a bill of particulars when the information charges a crime but fails to specify the particulars of the crime sufficiently to enable the defendant to prepare a defense. The court may require the prosecuting attorney to furnish the defendant with a bill of particulars. The State's evidence must be confined to the particulars of the bill. K.S.A. 22-3201(5).

The history of information sufficiency in this jurisdiction was discussed by Chief Justice Prager speaking for the court in *State v. Micheaux,* 242 Kan. at 198, and by Justice Lockett speaking for the court in *State v. Rasch,* 243 Kan. 495, 497, 758 P.2d 214 (1988).

K.S.A. 22-2103 establishes a legislative prologue for the code of criminal procedure. The code is intended to provide for the just determination of every criminal proceeding. Its provisions shall be construed to secure simplicity in procedure, fairness in administration, and the elimination of unjustifiable expense and delay.

We now turn to a discussion of jurisdiction. Article 3 § 6 (b) of the Kansas Constitution provides that district courts shall have such jurisdiction in their respective districts as may be provided by law.

The legislature has provided that each county shall have a district court of record which shall have general original jurisdiction of all matters both civil and criminal, unless otherwise provided by law. K.S.A. 20-301.

The district court holds exclusive jurisdiction to try all felony and other criminal cases. K.S.A. 22-2601.

The Kansas Constitution and legislative action have vested in the district courts of this state subject matter jurisdiction for felony cases. Subject matter jurisdiction is the power of the court to hear and decide a particular type of action. *State v. Matzke,* 236 Kan. 833, 835, 696 P.2d 396 (1985). The concept of subject matter jurisdiction is highlighted by the *Matzke* case. Matzke contended that the district court of Pottawatomie County lacked jurisdiction in his criminal proceeding because he had become an "Absolute Natural Person" by virtue of his affidavits, which purported to revoke all governmental agency powers. Such a revocation, he claimed, removed him from the strictures of our society and from the jurisdiction of the courts of Kansas. We held that the district court of Pottawatomie County had subject matter jurisdiction. It had the power to hear and decide Matzke's case. Personal (in personam) jurisdiction was acquired in Matzke's case when he was properly served as a resident of this State. The criminal action was properly initiated.

Subject matter jurisdiction lies in the district court and follows the defendant through the process of the issuing of the complaint, arrest pursuant to a warrant, initial appearance, the setting or denial of bond at the bond hearing, and the preliminary hearing, arraignment, and trial.

We have focused in Hall's case upon the claim of a defective information raised for the first time on appeal. An information is defined in K.S.A. 1989 Supp. 22-2202(12) as "a verified written statement . . . presented to a court, which charges the commission of a crime." (A "complaint" is a written statement under oath of the essential facts constituting a crime. K.S.A. 1989 Supp. 22-2202[8]. An "indictment" is a written statement, presented by a grand jury to a court, which charges the commission of a crime. K.S.A. 1989 Supp. 22-2202[11]).

Our past reasoning has dictated the reversal we have applied to Count II, the theft of the cattle, in the instant case. The word

"permanently" was omitted from the information. There was no incorporation by reference from Count III where "permanently" was alleged with reference to the theft of the truck and trailer that hauled the Count II cattle.

We note: (1) the jury was instructed properly as to all of the elements of theft in Counts II and III; (2) the information in Counts II and III cited the theft statute (K.S.A. 21-3701, listing a class E felony); (3) no bill of particulars was requested by Hall (K.S.A. 22-3201[5]); (4) no motion for arrest of judgment was filed (K.S.A. 22-3502); (5) Hall was represented by experienced retained counsel; and (6) no argument has been advanced by Hall that the omission of "permanently" in Count II of the information prejudiced him in any way or in any way interfered with the preparation of his defense. We have reversed Count II based upon precedent.

We now depart from that precedent. We depart from what we believe to have been a mistaken judicial blending of the concepts of "jurisdiction."

K.S.A. 22-3201 requires the information to be "a plain and concise written statement of the essential facts constituting the crime charged, which . . . information . . . drawn in the language of the statute, shall be deemed sufficient." Citation of the statute which the defendant is alleged to have violated is required but if omitted the omission is not fatal unless the defendant is prejudiced. We have then consistently held that if an element of the crime is omitted a jurisdictional defect is present which may be raised for the first time on appeal. *State v. Browning,* 245 Kan. 26, 774 P.2d 935 (1989); *State v. Wilson,* 240 Kan. 606, 731 P.2d 306 (1987).

We have also held that, pursuant to K.S.A. 22-3201(4), the trial court may permit an information to be amended at any time before verdict if no new crime is charged and if substantial rights of the defendant are not prejudiced. *State v. Rasch,* 243 Kan. 495, 758 P.2d 214 (1988). In *Rasch,* the defendant was convicted of four counts of aggravated robbery, one count of attempted aggravated robbery, and two counts of aggravated battery. Rasch claimed that the aggravated robbery convictions should be reversed because the State did not amend the jurisdictionally defective complaint. It was admitted that the complaint as originally

filed lacked the statutory language "[b]y threat of bodily harm . . . or by force." The State made an oral motion to amend the complaint, which was granted, and a subsequent journal entry cured the insufficiency of the complaint. In *Rasch* we held that when the defendant and counsel are present and permission is obtained from the judge, the State may orally amend the complaint or information any time before the verdict or finding, if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced. We also reasoned that, when the jury has been properly instructed on the elements of the crime, a complaint or information which the State has orally amended to correct a deficiency is valid unless the substantial rights of the defendant are prejudiced. The amendment may be shown by (1) interlineation on the complaint or information, (2) the filing of an amended information, or (3) a journal entry stating the amendment. *Rasch*, 243 Kan. at 501. In *Rasch*, the journal entry reflecting the amendment was filed and approved by Rasch's counsel nearly two months before trial. In *State v. Nunn*, 244 Kan. 207, 768 P.2d 268 (1989), the State moved to amend the information to reflect a change in dates in certain counts charging indecent liberties with a child at the close of the State's evidence to conform the charges with the evidence. The trial court granted the motion. Nunn contended that since the amendments were oral the State is bound by the original information. The journal entry recording the oral amendment was filed subsequent to trial. We held that when a motion to amend is made during trial, with defendant and counsel present, absent any showing of prejudice to the defendant, the amendment is effective immediately. The court's action is not invalidated because a written journal entry is not filed until after the trial has been completed. We extended the rationale of *Nunn* in *State v. Switzer*, 244 Kan. 449, 769 P.2d 645 (1989), to permit an oral amendment of the information during trial to be validated by a nunc pro tunc amendment to the journal entry ordered by this court in our opinion.

The cases that we have considered under K.S.A. 22-3201(5), in amending an information, have not presented insoluble jurisdictional problems. Jurisdiction does not descend on the proceedings at the moment the amendment is granted or, as in

*Switzer,* months or years later when the nunc pro tunc order is signed by the trial court after a ruling on appeal.

We also note our series of cases represented by *State v. Maxwell,* 234 Kan. 393, 672 P.2d 590 (1983). In *Maxwell,* and its predecessors, we considered a claim of a fatally defective information. Maxwell was charged with aggravated burglary. He claimed that, because the information did not specify the type of felony he was intending to commit at the time of entry into the residence, the information was defective. The argument, which was also advanced by the defendant in *State v. Lora,* 213 Kan. 184, 515 P.2d 1086 (1973), is that without knowing what evidence the State would present it was impossible to disprove the element of intent to commit a felony.

We reasoned that such an information was defective but that the defect does not automatically result in prejudicial error. There was no prejudicial error in *Maxwell* because the underlying felony was made clear to defendant before trial by "both the context of the other charges in the information and the preliminary hearing." 234 Kan. at 398.

The proper procedure for a defendant who contends either that the information does not charge a crime or that the court was without jurisdiction of the crime charged is to utilize the statutory remedy extended by the legislature for these two specific situations—a K.S.A. 22-3502 motion for arrest of judgment. This remedy, available for 10 days after disposition at the trial court level, is of benefit to a defendant. It is preferable to raise either or both of these claims in the trial court rather than waiting to raise the issues for the first time on appeal. If the motion is denied by the trial court, the denial may be appealed, if appropriate, to the Court of Appeals or to this court. This approach would allow the district court to pass on the defendant's contentions in timely fashion and to comply with what we deem to be the procedure intended by the legislature. The State is authorized by K.S.A. 22-3602(b)(2) to appeal from an order of the district court arresting judgment.

We continue to hold that a defendant, for the first time on appeal, may raise either the issue of trial court jurisdiction or the claim that the information does not charge a crime.

We have set out in this opinion the tests forming the rule we will apply in the future to determine the validity of such a "first time on appeal" claim. The longer it takes for the defendant to challenge the sufficiency of the information, the greater the presumption of regularity. 2 Orfield's Criminal Procedure under the Federal Rules § 12:97 (2d ed. 1985).

In *U.S. v. Campos-Asencio*, 822 F.2d 506 (5th Cir. 1987), the defendant was convicted of illegal reentry into this country after deportation. He raised for the first time on appeal the failure of the indictment to explicitly allege lack of consent by the attorney general to his reentry. Campos-Asencio argued that such an omission rendered the indictment insufficient. The Fifth Circuit, while noting that normally objections to an indictment are waived if not made before trial, commented that a defendant may at any time claim that an indictment fails to "charge the offense," citing Fed. R. Crim. Proc. 12(b)(2).

"However, when, as here, the defendant had notice of the issue, demonstrates no prejudice, and waits for appeal to assert his challenge, an appellate court will read the indictment liberally. *Oberski,* 734 F.2d at 1035; 2 W. LaFave & J. Israel, *Criminal Procedure,* 445-51. A statutory citation cannot, by itself, substitute for setting forth the elements of the crime, but a citation may reinforce other references within the indictment. *United States v. McLennan,* 672 F.2d 239, 244 (1st Cir. 1982). The indictment in the instant case both alleges that Campos was in the United States 'unlawfully' and points to the specific statute containing the lack of consent requirement. Hence the indictment sufficiently alleges lack of consent." 822 F.2d at 508.

We agree with the rationale expressed by the United States Court of Appeals for the Ninth Circuit in *United States v. Pheaster,* 544 F.2d 353 (9th Cir. 1976), *cert. denied* 429 U.S. 1099 (1977). One of the questions in *Pheaster* related to the sufficiency of the indictment. Defendants were convicted on all counts of a twelve-count indictment charging conspiracy to kidnap and mailing of requests for ransom and extortionate threats. The *Pheaster* court evaluated the challenge to the indictment against the fundamental requirements imposed by the Sixth Amendment. "A challenge to the sufficiency of an indictment is not a game in which the lawyer with the sharpest eye or the cleverest argument can gain reversal for his client. ' "Convictions are no longer reversed because of minor and technical deficiencies which did not prejudice the accused." ' " 544 F.2d at 360 (citing *Russell v.*

*United States,* 369 U.S. 749, 763, 8 L. Ed. 2d 240, 82 S. Ct. 1038 (1962). The defendant in *Pheaster* claimed that Count I of the indictment failed to state a federal offense and, therefore, was incapable of supporting his conviction. The Ninth Circuit, in upholding the sufficiency of the indictment, noted that the asserted inadequacy of Count I was first brought to the attention of the district court only after all the evidence had been received in an extensive jury trial. After observing that failure of an indictment to state an offense is a fundamental defect which can be raised at any time, the court commented, "However, the very limited resources of our judicial system require that such challenges be made at the earliest possible moment in order to avoid needless waste. Consequently, although such defects are never waived, indictments which are tardily challenged are liberally construed in favor of validity. For example, this Court held that when an indictment is not challenged before the verdict, it is to be upheld on appeal if ' "the necessary facts appear in any form or by fair construction can be found within the terms of the indictment." ' " 544 F.2d at 361. The court was of the opinion that, where the challenge to the indictment came in a motion for acquittal after all evidence had been received, the "long delay in raising the issue suggests a purely tactical motivation of incorporating a convenient ground of appeal in the event the jury verdict went against the defendants." 544 F.2d at 361. *Pheaster* notes that the fact of delay tends to negate the possibility of prejudice in the preparation of the defense. "When an objection to an indictment is not timely made, the reviewing court has considerable leeway to imply the necessary allegations from the language of the indictment." 544 F.2d at 362.

We find the following comments of *Pheaster* cogent to the sufficiency of an information issue. (1) The defendant in *Pheaster* did not claim either in the trial court or on appeal that the language of the indictment had in any way prejudiced the preparation of his defense; (2) defendant was represented by competent and experienced counsel, yet the challenge to the indictment came at the end of the trial, after all the evidence had been received; and (3) no claim had been made that the defective drafting of Count I of the indictment would in any way

impair Pheaster's ability to plead the conviction in any subsequent prosecution.

The Fifth Circuit in *United States v. Trollinger,* 415 F.2d 527, 528 (5th Cir. 1969), held that an initial challenge, raised for the first time on appeal, attacking the sufficiency of an indictment will fail and the indictment must be held sufficient unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant was convicted. The Second and Seventh Circuits have also so held; *United States v. Santelistes,* 476 F.2d 787 (2d Cir. 1973); *United States v. Knippenberg,* 502 F.2d 1056, 1061 (7th Cir. 1974) (The omission of the word "wilfully" in an indictment charging transportation of stolen securities in interstate commerce is not fatal although the terms of the statute, 18 U.S.C. § 2(b) (1988) state "wilfully.").

"[A]n indictment not challenged before trial will be upheld 'unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted.' " *United States v. Watkins,* 709 F.2d 475, 478 (7th Cir. 1983).

The Sixth Amendment provides that "the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." In *Russell v. United States,* 369 U.S. 749, 8 L. Ed. 2d 240, 82 S. Ct. 1038 (1962), the United States Supreme Court set forth the essential criteria for measuring the sufficiency of an indictment. It must contain the elements of the offense and sufficiently apprise the defendant of what he or she must be prepared to meet. In case of further proceedings against the defendant for a similar offense, the record must show with accuracy to what extent the defendant may plead a former acquittal or conviction. 369 U.S. at 763-64. In *Russell,* the petitioner had refused to answer questions before the House Un-American Activities Committee and, subsequently, was indicted for contempt of Congress. The United States Supreme Court held that the indictment must state the subject of the inquiry so that the court will have a basis for its determination of the pertinency of the questions asked the petitioner.

The Tenth Circuit has held that, in determining the sufficiency of an indictment challenged as being vague and indefinite, the whole of the indictment must be taken into consideration. *United*

*States v. Crummer,* 151 F.2d 958, 962 (10th Cir. 1945), *cert. denied* 327 U.S. 785 (1946).

Failure of an information to state an offense is a fatal defect and, like an allegation that the court is without jurisdiction, may be raised at any time during the pendency of the proceeding. K.S.A. 1989 Supp. 22-3208(3). The orderly resolution of criminal law issues requires timely raising of claims relating to the validity of an information. Tardily challenged informations are to be construed liberally in favor of validity. The validity of an information is to be tested by reading the information as a whole. The elements of the offense may be gleaned from the information as a whole. An information not challenged before verdict or finding of guilty or pursuant to K.S.A. 22-3502 by a motion for arrest of judgment will be upheld unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted. *United States v. Watkins,* 709 F.2d at 478.

We urge the defense bar to utilize this K.S.A. 22-3502 arrest of judgment defense tool. If the court did not have jurisdiction, or if the information did not charge a crime for which the defendant was convicted, the defendant is entitled to a determination of that condition at the trial court level.

We are applying a "common-sense" interpretation of informations when faced in the future with the issue of jurisdiction or failure to charge a crime as a result of a claimed defective information raised for the first time on appeal. We will review the information as a whole and interpret it to include facts which are necessarily implied. A tardy "first time on appeal" challenge to the information will be faced with a liberal construction in favor of validity. 1 Wright, Federal Practice and Procedure: Crim. 2d § 123 at 354 (1982); 5 Orfield, Criminal Procedure under the Federal Rules, § 34:4 at 389 (2d ed. 1987).

A motion for arrest of judgment is the proper procedure for a defendant who wishes to challenge the sufficiency of the information after trial because of either a claim that it did not charge a crime or that the court was without jurisdiction of the crime charged. When such a motion is timely filed, the trial court, in reviewing the motion, shall test its merit by utilizing the rationale of our pre-*Hall* cases.

We recognize that a defendant may raise these same two defect of information claims for the first time on appeal; however, for all informations filed after the date of this opinion, we prospectively adopt the following rule:

### The Prospective Rule

Information defect challenges raised for the first time on appeal shall be reviewed by applying (1) the reasoning of K.S.A. 22-3201(4) complaint/information/indictment amendment cases as expressed in *State v. Switzer*, 244 Kan. 449, 769 P.2d 645 (1989), *State v. Nunn*, 244 Kan. 207, 768 P.2d 268 (1988), and *State v. Rasch*, 243 Kan. 495, 497, 758 P.2d 214 (1988), as that reasoning relates to jurisdiction and the substantial rights of the defendant; (2) the "common-sense" test of *State v. Wade*, 244 Kan. 136, 766 P.2d 811 (1989), and *State v. Micheaux*, 242 Kan. 192, 747 P.2d 784 (1987); and (3) the rationale of *United States v. Pheaster*, 544 F.2d 353 (9th Cir. 1976), *cert. denied* 729 U.S. 1099 (1977). Of paramount importance, we shall look to whether the claimed defect in the information has: (a) prejudiced the defendant in the preparation of his or her defense; (b) impaired in any way defendant's ability to plead the conviction in any subsequent prosecution; or (c) limited in any way defendant's substantial rights to a fair trial under the guarantees of the Sixth Amendment to the United States Constitution and the Kansas Constitution Bill of Rights, § 10. If a defendant is able to establish a claim under either (a), (b), or (c), the defective information claim, raised for the first time on appeal, will be allowed.

We hereby overrule all cases contrary to the "claim of a defective information raised for the first time on appeal" rule announced in this opinion.

Reversed as to Count II, theft of cattle; affirmed as to all other issues.