No. 71,637

STATE OF KANSAS, *Appellee*, v. BRYAN K. DEPRIEST, *Appellant*.

(907 P.2d 868)

Opinion filed December 8, 1995.

*Julie A. Gorenc,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with her on the brief for appellant.

*Michelle V. Hostetler,* assistant district attorney, *Joan Hamilton,* district attorney, and *Carla J. Stovall,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: This is a direct criminal appeal from first-degree murder and conspiracy to commit first-degree murder convictions. The defendant, Bryan K. DePriest, contends that the trial court erred: (1) by omitting the element of intent from the first-degree murder instruction, (2) by failing to give a lesser included offense instruction, and (3) by failing to give an accomplice instruction. Finding no reversible error, we affirm.

Jesse Burton, Paul Moore, and the defendant were charged with first-degree murder and conspiracy to commit first-degree murder in connection with the slaying of Michael Hill. Hill's body was found in the bathtub of his home in Topeka. He had been shot five times. Pursuant to a plea agreement, Jesse Burton pled guilty to one count of second-degree murder and testified on behalf of the State.

Burton testified that he was a friend of Hill's and had sold cocaine for Hill. He testified that Hill agreed in early May to front him 15 ounces of cocaine on credit. At first, Hill gave Burton 9 ounces of cocaine which Burton then took to his friend and associate, defendant Bryan K. DePriest. The two of them cut the cocaine with a product known as Vita-Blend. They then sold the cocaine out of the defendant's father's house.

Burton then contacted Hill to obtain the additional 6 ounces he had been promised. Hill wanted the proceeds from the sale of the first 9 ounces. When Burton relayed this information to the defendant, the defendant told Burton that he was going to kill Hill and keep the money. The defendant stated that if Burton did not cooperate, he would kill Burton, Burton's girlfriend, and Burton's uncle.

According to Burton, the defendant forced him to stay at the defendant's father's house until Paul Moore arrived. When Moore joined them, the defendant whispered something to Moore and then told Burton to go with Moore. The defendant also handed Moore a gun. Burton and Moore traveled to Topeka looking for Hill. They located Hill at his girlfriend's home and eventually all three got together at Hill's house.

Burton testified that when they arrived at the house, they talked for a few minutes, and then Hill went into the bathroom. Moore followed Hill into the bathroom and shot Hill. Burton became scared and ran outside but eventually got back into Moore's car for the return trip to Kansas City.

Upon arriving in Kansas City, they first stopped at Moore's house, where Moore hid the murder weapon under the couch and gave money that he had taken from Hill to his girlfriend. Moore also gave Burton approximately $400 of the money. They then went to the defendant's house; the defendant asked Moore if he had taken care of the job. Moore said he had and described the killing to the defendant. Moore then gave Burton a ride home.

Burton testified that he was scared of Moore because Moore "don't really have it all." Burton stated that Moore is kind of crazy and does whatever the defendant tells him to do. He reported instances in which Moore stole cars and beat up people at the request of the defendant.

The deceased's best friend, Maurice Brantley, also a friend of the defendant's, testified that Hill and the defendant were friends but that the defendant did not like the way Hill had been acting. Brantley stated that the defendant thought Hill was very self-centered. According to Brantley, 3 or 4 days before the shooting, he, Burton, the defendant, and some other people were talking when Hill drove up and began talking to Burton. After Hill drove off, Burton told the defendant that Hill wanted Burton to make a trip to Topeka. Burton looked as though he did not want to go. Brantley stated that he told Burton that if he did not want to go, he should not go. Then, according to Brantley, the defendant went into the house and came back with a handgun, which he tried to give to Burton. However, Brantley talked Burton out of taking the gun.

When asked about Burton and Moore's character, Brantley stated that Paul Moore is a "go-fer" for the defendant. According to Brantley, Moore will do anything that the defendant asks him to do. Burton, on the other hand, is not a very aggressive person and is a "follower." Brantley stated that many times, Burton would talk about being unhappy over the way Hill treated him.

Several of the defendant's friends testified on his behalf. Dennis Moore, the defendant's cousin, testified that Burton was talking about how Hill had not paid him enough for selling cocaine and how Burton wanted to kill Hill. According to Dennis Moore, Burton stated he was going to "get" Hill. Marvin Bland, another friend of the defendant, testified that he overheard Burton telling the defendant that he wanted to kill a certain person who owed him money. According to Bland, the defendant later told Bland that Burton had been talking about Hill. On another occasion, Bland overheard Burton talking to another person about Hill. During that conversation, Burton stated that he wanted to shoot Hill. According to Bland, Burton had stolen some drugs from Hill and was worried that Hill would come after him.

Gregory Hill, Jr., a cousin of the defendant's, testified that he heard Burton state that he needed money to make payments on his motorcycle and that Burton mentioned that Hill owed him some money for selling drugs. Gregory Hill stated that he had a gun belonging to the defendant and that he gave Burton the gun to give back to the defendant.

The defendant testified on his own behalf. He stated that he got along well with Michael Hill but did not like the fact that Hill would not help Maurice Brantley when he needed money. The defendant denied telling Jesse Burton to kill Hill. He further denied attempting to hand Burton a gun, as Brantley had testified.

When asked about his relationship with Paul Moore and Jesse Burton, the defendant stated that he and Moore got along well but that at one point he made Moore stop dealing drugs for him because Moore would "short him" on deals. He stated that Burton was continually upset with Hill because Hill would not pay him enough. The defendant stated that Burton talked of killing Hill on five or six occasions but that he did not think Burton was serious.

The defendant testified that he had given Burton the money for the first 9 ounces of cocaine and told him to give it to Hill. For the remaining 6 ounces, he gave Burton money for the first 2 ounces but kept the proceeds from the sale of the remaining 4 ounces as his cut. He testified that this was a traditional cut and Hill did not expect to be paid the entire proceeds of the 15 ounces. The defendant expected that Burton would pay Hill the money; he did not know Hill had been shot until being informed later by Maurice Brantley. When he heard his name come up as a suspect, he went to the police to clear up any misunderstanding.

The defendant's taped statement to the police was admitted into evidence. In this statement, he told police that he knew Jessie Burton and Paul Moore traveled to Topeka to kill Hill, although he denied playing any part. According to the defendant's statement, Burton had been talking about killing Hill for a long time.

Paul Moore testified that on the night of the shooting, he had gone to a basketball court near his house, where he had become involved in a fight with an acquaintance of his known as Rico. During the fight, he injured his hand and it became swollen. As a result, he stayed around his house and went to bed. He denied going to Topeka and denied killing Hill. Although he admitted selling cocaine for the defendant, he denied performing any other errands for the defendant.

At the close of the evidence, the defendant proposed that the court instruct the jury in accord with PIK Crim. 3d 56.01 on first-degree murder. The defendant did not request instructions on a lesser included offense or accomplice testimony. The district court gave the requested instructions, although it modified the instruction on first-degree murder.

## (1) FIRST-DEGREE MURDER INSTRUCTION

The defendant contends that the trial court omitted an essential element of the charge of first-degree murder in its jury instruction, thereby relieving the State from its burden of proving intent, an essential element of first-degree murder.

The defendant requested the following instruction on first-degree murder:

"To establish this charge, each of the following claims must be proved:

1. That the defendant intentionally killed Michael A. Hill;
2. That the killing was done with premeditation; and
3. That this act occurred on or about the 10 day of May, 1993, in Shawnee County, Kansas." See PIK Crim. 3d 56.01.

The district court, however, gave the following instruction on first-degree murder, which recognized that the defendant was not the actual triggerman but an aider and abettor:

"To establish this charge, each of the following elements of the offense must be proved:

1. That a person for whose conduct the defendant is criminally responsible, willfully killed Michael A. Hill;
2. That such killing was done maliciously;
3. That such killing was done deliberately and with premeditation;
4. That this act occurred on or about the 10th May, 1993, in Shawnee County, Kansas."

We begin our analysis with the fact that the defendant remained in Kansas City while, according to the theory of the State, Moore went to Topeka at the direction of the defendant and killed Hill. Faced with these facts, the trial judge modified the standard PIK Crim. 3d 56.01 instruction by stating in Paragraph 1 "that a person for whose conduct the defendant is criminally responsible, willfully killed Michael A. Hill." It is clear that the word *intent* is not included in this first paragraph.

The defendant's contention is twofold. First, he contends that the element of intent is left out of the first-degree murder instruction, thereby relieving the State of the burden of proof of an essential element of the offense. Second, the defendant contends that the State must prove beyond a reasonable doubt that the defendant intentionally killed Hill, not just that he aided Moore in the commission of a first-degree murder with intent to carry out the crime.

In regard to the defendant's first contention, we need only to read the instruction given on first-degree murder, as well as the instructions as a whole, to conclude that the defendant's contention lacks merit. In its instruction on murder, the court stated in part that the following elements of the offense must be proved: that such killing was done maliciously and that such killing was done

deliberately and with premeditation. In the very next instruction, the court stated that murder in the first degree is premeditated murder which is defined in Instruction No. 9. Instruction No. 9 sets forth the definition of premeditated murder as the killing of a human being committed maliciously, willfully, deliberately, and with premeditation. Each term used is defined in further instructions: "Willfully means conduct that is purposeful and intentional and not accidental." "Maliciously means willfully doing a wrongful act without just cause or excuse." "Deliberately and with premeditation means to have thought over the matter beforehand."

When considered as a whole, it cannot be seriously argued that because the court did not include the word *intent* in the first part of the instruction on first-degree murder, as outlined in PIK Crim. 3d 56.01, it relieved the State of the burden to prove intent. This is so because the additional language used in parts 2 and 3 of the instruction given by the court, with the further definition contained in Instruction No. 9, clearly required the State to prove intent.

The second contention of the defendant is that even though the defendant was in Kansas City at the time the murder was committed in Topeka, and the defendant could only be found guilty as an aider and abetter, the State is nevertheless required to prove beyond a reasonable doubt that the defendant had the intent to commit first-degree murder.

The defendant was necessarily convicted of aiding and abetting first-degree murder. A person may be convicted under the theory of aiding and abetting a crime if the person, either before or during its commission, aides or abets another to commit a crime with the intent to promote or assist in its commission. See K.S.A. 1994 Supp. 21-3205(1). The jury was so instructed in Instruction No. 4. Instruction No. 2, the one of which the defendant complains, instructed the jury that the defendant could be convicted of first-degree murder if the "person for whose conduct the defendant is criminally responsible" willfully, maliciously, deliberately, and with premeditation killed Hill. Read together, these instructions informed the jury that the defendant could be convicted if the person for whose acts he was criminally responsible maliciously, deliber-

ately, and with premeditation killed Hill and that the defendant aided or abetted the crime with intent to promote it.

The defendant contends that the Kansas Legislature has chosen to do away with aiding and abetting as an alternate theory of committing the crime; therefore, a defendant must be found guilty of all the elements of the underlying offense, citing *State v. Pennington*, 254 Kan. 757, 869 P.2d 624 (1993). However, *Pennington* does not stand for this proposition. Instead, *Pennington* merely holds that the State is not required to charge aiding and abetting in the charging document in order to pursue an aiding and abetting theory at trial. See 254 Kan. at 764.

In order to find the defendant guilty of aiding and abetting first-degree murder, the jury was required to find that a first-degree murder had been committed and that the defendant aided and abetted that murder with the intent to assist in its completion. Jury Instructions No. 2 and No. 4, read together, adequately instructed the jury on this issue. We conclude that the instructions given did not impermissibly relieve the State of its burden to prove each of the elements of the crime charged.

## (2) LESSER INCLUDED OFFENSE INSTRUCTION

The defendant contends that the trial court was under a duty to instruct the jury on the crime of solicitation to commit first-degree murder because under *State v. Fike*, 243 Kan. 365, 368, 757 P.2d 724 (1988), it is a lesser included offense of the offense of aiding and abetting first-degree murder. The defendant advances two arguments based upon the two-pronged test set forth in *Fike*. Under the first prong of *Fike*, he claims that solicitation is a lesser included offense of aiding and abetting first-degree murder because "all of the statutory elements of the alleged lesser included crime are among the statutory elements required to prove the crime charged." 243 Kan. at 368. Under the second prong of *Fike*, he claims that it is a lesser included offense because "the evidence which must be adduced at trial for the purpose of proving the crime as charged would also necessarily prove the lesser crime," thereby coming under the definition in K.S.A. 21-3107(2)(d). 243 Kan. at 368.

We need not engage in a *Fike* analysis under the facts of this case because solicitation to commit first-degree murder is an independent criminal offense, separate and distinct from aiding and abetting first-degree murder. K.S.A. 1994 Supp. 21-3303(a) defines criminal solicitation as "commanding, encouraging or requesting another person to commit a felony, attempt to commit a felony or aid and abet in the commission or attempted commission of a felony for the purpose of promoting or facilitating the felony." Solicitation is a specific intent crime under Kansas law. A person is not guilty of solicitation unless he or she intentionally commits the actus reus of the offense, *viz.*, he or she commands, encourages, or requests another person to commit a felony with the specific intent that the other commit the crime he or she solicited. The actus reus of the solicitation occurs under Kansas law if a person by words or actions invites, requests, commands, or encourages a second person to commit a crime. The crime is complete when the person communicates the solicitation to another with the requisite mens rea. No act in furtherance of the target crime needs to be performed by either person.

K.S.A. 1994 Supp. 21-3205(1), on the other hand, states that "[a] person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime." Thus, if a person solicits another to murder the victim, as happened in this case, and the person solicited murders the victim, the defendant is an accomplice in the commission of the murder and may be convicted of that offense. In these circumstances, the crime of solicitation is a separate offense, not a lesser included offense of aiding and abetting first-degree murder. See *State v. Edwards*, 250 Kan. 320, 330-331, 826 P.2d 1355 (1992) (holding that criminal solicitation is a separate and distinct offense from aiding and abetting the crime of making a false writing).

The evidence in this case was that the defendant solicited Moore to murder Hill. The evidence also established that Moore killed Hill. The question for resolution by the jury was whether the defendant aided and abetted in the commission of the murder. The

jury found that he did. Once this was established, the defendant was guilty of murder.

The defendant was either guilty of murder as an aider and abettor or he was not guilty. The defendant was not charged with the separate offense of solicitation. The jury found that the evidence established beyond a reasonable doubt that the defendant encouraged or requested Moore to commit murder and, thereby, was guilty of the murder as an aider and abettor of the murder.

## (3) ACCOMPLICE TESTIMONY INSTRUCTION

The defendant's final argument is that the district court erred in failing to instruct the jury that it should consider with caution the testimony of an accomplice. The defendant states that because Jesse Burton was the only witness to the defendant's involvement in the crime, the district court should have given the accomplice instruction. The defendant did not request such an instruction.

It is well settled in Kansas that

"[n]o party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds for the objection, unless the instruction is clearly erroneous. K.S.A. 22-3414(3). An instruction is clearly erroneous only if the reviewing court reaches a firm conviction that if the trial error had not occurred there is a real possibility the jury would have returned a different verdict. [Citation omitted.]" *State v. Whitaker*, 255 Kan. 118, 125, 872 P.2d 278 (1994).

The failure then to give an instruction on accomplice testimony when none is requested requires reversal only if "clear error" occurred. *State v. Thomas*, 252 Kan. 564, Syl. ¶ 7, 847 P.2d 1219 (1993). In determining whether prejudicial error has occurred, courts generally look to the extent and importance of the accomplice testimony, as well as any corroborating testimony. See *State v. Moore*, 229 Kan. 73, 80, 622 P.2d 631 (1981).

In this case, the testimony of Jesse Burton was vitally important because it was the only testimony linking the defendant to the crime. Burton's testimony was partially corroborated in that the defendant admitted that he knew Paul Moore and Jesse Burton were travelling to Topeka in order to kill Michael Hill and that he

and Burton were involved in selling cocaine. There was also testimony that Burton was a "follower" and that Paul Moore, who did the bidding of the defendant, was a "go-fer" for the defendant. Moreover, the evidence suggested that Moore had, in the past, stolen cars and beaten up people at the request of the defendant.

As early as 1910, this court stated, in a case where the defendant claimed error for failure to give an accomplice instruction even though none had been requested, that "[w]ithout such an instruction a jury of ordinary intelligence would naturally receive with caution the testimony of a confessed accomplice." *State v. Miller*, 83 Kan. 410, 412, 111 Pac. 437 (1910), *rev'd on other grounds* 84 Kan. 667, 114 Pac. 855 (1911). In *State v. Parrish*, 205 Kan. 178, 186, 468 P.2d 143 (1970), in discussing the trial court's failure to give a requested instruction on accomplice testimony, we said that "[t]he necessity for many of these tautological instructions is losing force when a case is being considered by our present enlightened jurors." In a discussion of this issue in *Moore*, we quoted with approval the following language from an early decision of Judge Learned Hand in *United States v. Becker*, 62 F.2d 1007, 1009 (2d Cir. 1933):

" 'The warning [accomplice instruction] is never an absolute necessity. It is usually desirable to give it; in close cases it may turn the scale; but it is at most merely a part of the general conduct of the trial, over which the judge's powers are discretionary, like his control over cross-examination, or his comments on the evidence. If he thinks it unnecessary—at least when, as here, the guilt is plain—he may properly refuse to give it.' " 229 Kan. at 79.

Unlike the *Becker* and *Parrish* courts, we are not faced with the situation where the defendant requested an instruction. Because there is corroboration of the accomplice's testimony, and because a jury of ordinary intelligence would naturally receive with caution the testimony of Burton, we conclude that there was no real possibility the jury would have reached a different result had the instruction been given.

Affirmed.