No. 81,149

STATE OF KANSAS, *Appellee*, v. GENE MILLER, *Appellant*.
(997.P.2d 90)

Opinion filed February 11, 2000.

*Mary D. Curtis*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Darrell E. Miller*, county attorney, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Gene Miller, from his conviction for first-degree murder. The victim, Nathan Harlow, was 17 years of age. Miller is serving a life sentence without the possibility of parole for 25 years.

Miller raises three issues on appeal. Miller contends the prosecutor elicited improper testimony from a State witness (testimony that photos of Miller used in a photo lineup had been taken when Miller was arrested previously and that Miller had refused to meet with officers investigating this murder) and that prosecutorial mis-

conduct in closing argument denied him his right to a fair trial. Miller also claims the trial court failed to give a cautionary instruction on accomplice testimony and abused its discretion by unduly limiting the jury's request for a read-back of testimony.

When the facts are viewed as we are required to view them, the following occurred. In July 1997, the disking of a field of wheat stubble turned up Harlow's body. Harlow had run away following a juvenile hearing in Nebraska at which Harlow was committed to a Nebraska boys' home.

Harlow had helped Jeremy King steal a car, and the police had been looking for Harlow. King was afraid Harlow would tell the police what had happened. Miller, John Wilson, King, and Harlow drove into the countryside. Harlow went on foot to a field where he was shot and his throat was cut. Harlow died as a result of the wounds.

At trial, Miller's defense was alibi. His mother and his girlfriend testified in his behalf. Wilson, King, and others testified for the State.

## I. TESTIMONY AND PROSECUTORIAL STATEMENTS

Miller argues that the prosecutor elicited improper testimony during the course of the trial. Miller specifically argues that the following evidence was improperly admitted: evidence of his prior arrests, evidence that he refused to cooperate with police during the investigation, and other facts presented to the jury which had not been properly introduced as evidence. The State argues that none of these evidentiary questions were preserved for appeal because trial counsel failed to object to any of them.

We do not review evidentiary issues which were not objected to at trial. K.S.A. 60-404; see *State v. Sims*, 262 Kan. 165, 170, 936 P.2d 779 (1997) (failure to object to the admission of evidence at the trial court level precludes review by an appellate court); *State v. Cheeks*, 258 Kan. 581, 594, 908 P.2d 175 (1995) (defense counsel's failure to object to evidence of prior crimes precludes the appellate courts from considering the issue); *State v. Jordan*, 250 Kan. 180, 192, 825 P.2d 157 (1992) (court dismissed issue of ad-

missability of prior crimes evidence because the defendant failed to object at trial).

The record reflects that Miller did not make one single objection to any of the evidence that is now complained of. Without such objection, we are precluded from reviewing the issues Miller attempts to raise on appeal.

## II. PROSECUTOR'S CLOSING ARGUMENT

Miller argues that the prosecutor made several improper remarks during his closing argument. Specifically, Miller argues that the prosecutor called him a liar, referred to him as a "Dr. Jekyll and Mr. Hyde," and implied to the jury that if it did not convict him, he would be free to kill again. The State argues that Miller never objected to the prosecutor's statements and, furthermore, that the statements were not so gross and flagrant as to prejudice Miller's right to a fair trial and require a reversal.

We recently reviewed our standard of review for prosecutorial misconduct during closing argument. See *State v. Pabst*, this day decided, 268 Kan 501, 996 P.2d 321 (2000). In *Pabst*, we said:

"Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial. See *State v. Sperry*, 267 Kan. 287, 308, 978 P.2d 933 (1999). Some complained-of prosecutorial statements were not objected to at trial. If the claimed error has been determined to implicate a defendant's right to a fair trial, our standard of review is the same whether or not an objection was made at trial. If the claimed error rises to the level of a denial of the Fourteenth Amendment right to due process, the issue will be addressed. *State v. McCorkendale*, 267 Kan. 263, Syl. ¶ 6, 979 P.2d 1239 (1999).

. . . .

"The analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, we decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence. Second, we must decide whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal. *State v. Lumley*, 266 Kan. 939, Syl. ¶ 12, 976 P.2d 486 (1999)." 268 Kan. at 504-05.

Here, the first incident complained of occurred when a Nebraska criminal investigator was testifying concerning a photo

lineup he showed Wilson. Wilson picked Miller's photo as the person he had talked to in Wilson's home. The investigator was asked what he did "in reference to that photo lineup" and responded:

> "Some of the information that we received was that Jeremy King and Gene Miller were in the home of John Wilson, and to make sure that we were talking about the same individual involved, I put together a photo lineup with Gene Miller's photograph that I obtained from the Hall County sheriff's department. Mr. Miller had been *arrested there previously,* and so I obtained his photograph, along with five others, and put it in a photo lineup to show Mr. Wilson, and—at which time Mr. Wilson pointed out to me that Gene Miller was the one that was at his residence." (Emphasis added.)

While defense counsel did not object to the investigator's testimony, he did have the investigator clarify, on cross-examination, that Gene Miller had never been convicted of a crime.

Later, during the cross-examination of Gene Miller by the county attorney, the State returned to this topic:

"Q. Do you know Jacob Gutierrez?

"A. Jacob Gutierrez? Yes, sir.

"Q. Is he a part of your circle of friends?

"A. No, sir.

"Q. Ever been with him?

"A. Yeah, a long time back.

"Q. As a result of that, did some trouble arise?

"A. He got in trouble.

"Q. And were you and he both questioned about a shooting?

"A. Yes, sir.

"Q. Were you—in Grand Island?

"A. That's where they told me it happened.

"Q. You didn't know anything about it though either, is that correct?

"A. No, sir.

"Q. And those officers were, once again, just mistaken as to your involvement in that, is that correct?

"A. No, sir, they got the true story later on.

"Q. Had you confused with Jacob Gutierrez?

"A. No, sir.

"Q. When you went, first went in to see the officers, the officers said that they asked you if you had seen Nathan Harlow and you said no, you hadn't seen him for two years?

"A. No, sir, they asked me if I had had a conversation with Nathan Harlow.

"Q. They're mistaken then when they said that you said you hadn't seen him since 1995?

"A. Yes, sir.
"Q. They're just absolutely mistaken, all of these officers?'"

Immediately on the heels of this exchange, the State moved on to another topic:

"Q. They [the officers] asked you to come back the next day to help clear up some things, did they not?
"A. Yes, sir.
"Q. And you didn't go, did you?
"A. I contacted my lawyer, and he said do not get ahold of them.
"Q. Okay, now you're absolutely unable to dispute John Wilson's account of this murder, is that correct?'"

In its examination of Kansas Bureau of Investigation Agent Delbert Havel, the State's attorney also pointed out that Miller had refused to meet with officers a second time. He established that officers had gone by the trailer twice in one day to find Miller. The first time Jennifer Nebe's, Miller's girlfriend, car was not there; however, when they came back, it was.

"Q. Did you and the other officers then approach the trailer?
"A. Two officers or two agents did. Myself and a deputy from here in Jewell County remained out on the street.
"Q. Okay. Were the officers met with somebody at the door?
"A. Yes, they were met by a younger white female.
"Q. Did you later learn the identity of the female.
"A. Yes, later they said it was Mr. Miller's girlfriend.
"Q. Jennifer Nebe or Nebe [sic]?
"A. Something like that, yes, sir.
"Q. Did they ask to go in and see if they could talk to Gene?
"A. Yes.
"Q. Were they denied entry?
"A. That is correct.
"Q. While you were there, did the defendant's mother arrive?
"A. Yes, a few minutes later.
"Q. Again, did you—you and the other officers attempt to inquire about the— inquire as to the whereabouts?
"A. Myself and the deputy that was sitting with me told the defendant's mother that we just wanted to find Mr. Miller and visit with him.
"Q. Okay. And what was the response?
"A. Her response was not till his attorney gets here."

Again, in cross-examination of Miller, the State attempted to elicit his admission that he had been there and had refused to meet with officers:

"Q. When officers came by the house that day to visit with you about the facts and about this case, were you there, were you in the house?

"A. When they talked to me in the driveway.

"Q. No, when they came by, and you were here when Officer Havel talked, testified today, is that correct?

"A. Yes, sir.

"Q. And he says when they came by the first time, the white car wasn't there. Do you recall him saying that?

"A. Yes, sir.

"Q. And he said that when he came back the second time, the white car was there, is that right?

"A. Yes, sir.

. . . .

"Q. If you went to work, that's the only means you had to get there, was to drive the white car, is that right?

"A. Yes, sir.

"Q. And so that meant that when they came by, you had to be there, isn't that correct?

"A. No, sir. I may have left with someone.

"Q. With somebody else?

"A. Yes, sir."

Not satisfied, the State returned to the topic yet again in closing argument:

"Gene Miller at this crime scene? Sure, he was. You absolutely know that. Sure, he was. If he was there, and you know he was, if it didn't happen just like those other two guys said it happened, don't you think he would be beating down these investigators' doors, don't you think he would be telling them, 'I didn't shoot him, Jeremy King shot him, I didn't shoot him, John Wilson shot him?' That didn't happen, did it?"

Miller also accuses the State of reference to facts not in evidence in the following exchange:

"Hair color was an issue in the case since Billy Lewellyn's hair had been described as lighter than Gene's. On cross-examination, the prosecutor also asked Gene:

'Q. Now, your hair is much darker now than it was at the time of your arrest?

'A. No, sir.

'Q. It was sun-bleached when you were arrested? I have some pictures if you would like to see them.

'A. It may be darker, I can't tell.' "

Miller also alleges improper remarks in closing argument as follows:

"During closing argument, the prosecutor first told the jury that Gene Miller 'has absolutely and unequivocally lied to these investigators.' . . . He followed that, during his rebuttal remarks, by referring to Gene as 'a Dr. Jekyll and a Mr. Hyde . . . . In your presence, he's quiet and he's polite. He's probably that way with his girlfriend, probably that way with his mother. Now, put a sawed-off shotgun in his hand and load him up with the feeling of euphoria you get from marijuana and crank, that's the Gene Miller that Nathan had to deal with, that's the Gene Miller you need to judge.' . . . And then, in the same breath, he concluded with these remarks: 'I want to tell you how utterly important your decision in this case is. This is the only trial there will ever be of Gene Miller as it relates to this case. You're the only jury that is ever going to hear this case. If you find him not guilty, he'll walk out those doors a free man, never to be tried again for the killing of Nathan Harlow.' "

The evidence and comments in this case do not rise to the level of those in the *Pabst* case. Here, the evidence admitted without objection falls under our contemporaneous objection rule. The improper arguments were not so gross and flagrant as to have prejudiced the jury against the accused and denied him a fair trial.

### III. ACCOMPLICE TESTIMONY

Miller argues that an instruction should have been given to the jury regarding accomplice testimony. No party may assign as error the giving or failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds for the objection, unless the instruction or the failure to give the instruction is clearly erroneous. K.S.A. 22-3414(3); *State v. Crabtree*, 248 Kan. 33, 39, 805 P.2d 1 (1991). The failure to give an instruction on accomplice testimony when none is requested requires reversal only if "clear error" occurred. *State v. Thomas*, 252 Kan. 564, Syl. ¶ 7, 847 P.2d 1219 (1993).

An instruction is clearly erroneous only if the reviewing court reaches a firm conviction that if the trial error had not occurred

there is a real possibility that the jury would have returned a different verdict. *State v. DePriest*, 258 Kan. 596, 605, 907 P.2d 868 (1995); *State v. DeMoss*, 244 Kan. 387, 391-92, 770 P.2d 441 (1989). In determining whether prejudicial error has occurred, courts generally look to the extent and importance of the accomplice testimony, as well as any corroborating testimony. *DePriest*, 258 Kan. at 605.

Miller argues that the jury should have been given an instruction on accomplice testimony, as much of the damaging testimony against Miller came from Wilson and King, who were both present at the time of the murder.

PIK Crim. 3d 52.18 reads: "An accomplice witness is one who testifies that (he)(she) was involved in the commission of the crime with which the defendant is charged. You should consider with caution the testimony of an accomplice."

In *DePriest*, the defendant argued on appeal that the jury should have been given an instruction on accomplice testimony, even though the defendant had failed to request one at trial. The court noted that an instruction on accomplice testimony is not a strict requirement and failure to give one does not automatically require reversal. 258 Kan. at 606.

" ' "The warning [accomplice instruction] is never an absolute necessity. It is usually desirable to give it; in close cases it may turn the scale; but it is at most merely a part of the general conduct of the trial, over which the judge's powers are discretionary, like his control over cross-examination, or his comments on the evidence. If he thinks it unnecessary—at least when, as here, the guilt is plain—he may properly refuse to give it." ' " 258 Kan. at 606 (quoting Judge Learned Hand in *United States v. Becker*, 62 F.2d 1007, 1009 [2d Cir. 1933]).

In the present case, Miller failed to request an instruction on accomplice testimony. The defense counsel in *DePriest* likewise failed to request an instruction on accomplice testimony. The *DePriest* court looked at whether the testimony of the accomplice was corroborated and stated:

"Because there is corroboration of the accomplice's testimony, and because a jury of ordinary intelligence would naturally receive with caution the testimony of [an accomplice], we conclude that there was no real possibility the jury would have reached a different result had the instruction been given." 258 Kan. at 606.

In the present case, the testimony of Wilson and King was not identical. Corroborating testimony, however, does not need to be a mirror image of the accomplice's testimony. The essential facts of this case remain undisturbed and corroborated by several additional witnesses. A jury of ordinary intelligence would have been able to discern that the testimony of Wilson and King should be taken with caution. The jury heard testimony from both Wilson and King and was able to judge for itself the character of these men. The jury knew that Wilson and King did not have "clean hands" in this case. We cannot say that there is a real possibility that the jury would have reached any other conclusion had the instruction on accomplice testimony been given. There was no clear error in this case.

## IV. REQUEST FOR A READ-BACK

Miller argues that the trial court abused its discretion by unduly limiting the jury's request for a read-back of testimony. The State argues that Miller failed to object to the trial court's response and, therefore, the issue was not properly preserved for appeal. The State further argues that the trial court gave the jury the specific testimony that it had requested.

In *State v. Boyd*, 257 Kan. 82, Syl. ¶ 2, 891 P.2d 358 (1995), we stated:

"A trial court may not ignore a jury's request submitted pursuant to K.S.A. 22-3420(3) but must respond in some meaningful manner or seek additional clarification or limitation of the request. It is only when the trial court makes no attempt to provide a meaningful response to an appropriate request or gives an erroneous response that the mandatory requirement of K.S.A. 22-3420(3) is breached. Once the trial court attempts to give an enlightening response to a jury's request or seeks additional clarification or limitation of the request, then any issue as to the sufficiency or propriety of the response is one of abuse of discretion by the trial court."

During deliberations, the jury sent three requests to review the testimony. Miller failed to object to any of the jury's requests. Indeed, the record reflects that Miller agreed that the first two responses by the trial court were appropriate.

In the first request, the jury asked for testimony of and/or police reports involving King, Wilson, and Wilson's wife, Tamera. No

transcript existed at the time, and police reports were not part of the evidence presented at trial. The judge sent the jury a note asking it to focus its question.

In the second request, the jury asked for the testimony of King, Wilson, and Tamera. Again, the judge asked the jury to be more specific and to request only the specific parts of the testimony that it needed because there was no transcript and the testimony would have to be read from the reporter's shorthand notes.

In the third request, the jury specifically asked for the testimony of Wilson concerning the events at the crime scene. The judge had the court reporter read back portions of Wilson's testimony. None of Tamera's or King's testimony was read.

The read-back was not objected to by Miller. Indeed, the trial court gave the jury what it had specifically asked for and nothing more. If the jury had wanted to hear a specific part of Tamera's testimony or a specific part of King's testimony, it could have so requested. The jury was apparently satisfied with the trial court's response as it did not request any more read-backs. It is not an abuse of discretion for the trial court to instruct the court reporter to read back the testimony that the jury specifically requested and nothing more. See *State v. Juiliano*, 268 Kan. 89, Syl. ¶ 2, 991 P.2d 408 (1999) (it is not an abuse of discretion for the trial court to limit the read-back of testimony to the direct examination when the jury did not specifically request testimony contained in the cross-examination); *State v. Gilley*, 5 Kan. App. 2d 321, 323, 615 P.2d 827, *rev. denied* 228 Kan. 807 (1980) (when the trial judge provides the jury with the specific portions of testimony that it has requested, the judge has fulfilled the requirements of K.S.A. 22-3420[3]); see also *State v. Myers*, 255 Kan. 3, 8, 872 P.2d 236 (1994) (the trial court has the discretion to clarify and focus the jury's inquiry when it requests a read-back of testimony).

Miller also argues in his brief that he should have been allowed to review the testimony before the trial court had it read back to the jury. This argument is without merit. Miller was present when the testimony was taken in court. Miller participated in all aspects of the trial. Miller is not entitled to review the read-back testimony before the trial court determines what portions will be read back

to the jury. Miller retains the right to object, however, as the testimony is being read back and can do so at any time. In this case, Miller failed to make a single objection during the read-back and, therefore, has failed to preserve the issue for appeal. See *Boyd*, 257 Kan. at 89 (the defendant's failure to object to the read-back of testimony precludes any review of the read-back issue on appeal).

Affirmed.