No. 82,686

STATE OF KANSAS, *Appellee,* v. TERRY LEE HOOKER, JR.,
*Appellant.*
(21 P.3d 964)

Opinion filed April 20, 2001.

*Debra J. Wilson,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with her on the brief for appellant.

*Terra D. Morehead,* assistant district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Carla J. Stovall,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: Terry Lee Hooker, Jr., appeals his convictions for first-degree felony murder, aggravated burglary, and criminal possession of a firearm. K.S.A. 21-3401; K.S.A. 21-3716; K.S.A. 2000 Supp. 21-4204.

The issues for review include whether the district court erred by: (1) failing to instruct the jury regarding unanimous verdicts, (2) denying Hooker's motion for arrest of judgment, and (3) excluding evidence that two other people had threatened to harm the victim. We also review Hooker's claim of prosecutorial misconduct during closing arguments.

Our jurisdiction is under K.S.A. 22-3601(b)(1) (a conviction resulting in a life sentence receives automatic review by this court).

Finding no reversible error, we affirm.

## FACTS

Hooker was charged with aggravated burglary, criminal possession of a firearm, and the first-degree felony murder of Daron "Bootsie" Lane. In Hooker's first trial the jury could not reach a verdict. The district court declared a mistrial. On June 22, 1998, Hooker was again brought to trial and was found guilty of all three charges.

Lane was killed after two men forced their way into the apartment he shared with his girlfriend, Chillena Kane, and her sister, Oletha Kane. One man, later identified as Terry L. Hooker, Jr., the defendant, asked for "the money."

In September 1997, Hooker lived at Crestwood Apartments with his girlfriend, Kendra Cooks, and her sister LaTisha Bell. According to Brandon Heard, LaTisha's boyfriend, Hooker was at the apartment on the evening of September 23. Heard testified that he went by the apartment around 6:30 p.m. on September 23. He left for a choir rehearsal. After finding that rehearsal had been canceled, he returned around 7:30 or 8 p.m. Heard stayed until about 11:45 p.m. He testified Hooker was at the apartment the whole evening. When Heard left, Hooker was in his room, wearing his "sleep clothes" and writing raps.

Heard saw Hooker's picture on the television news after Hooker had been arrested in connection with Lane's death. Heard called

the TIPS hotline because he did not think Hooker could have killed Lane. Kendra Cooks also testified that Hooker was at the apartment on the night of September 23. Hooker left around 6 p.m. to take LaTisha Bell to her grandfather's house and returned at about 7 p.m. Kendra said Hooker stayed at the apartment the rest of the night. She also told the same story to the police.

Hooker testified that he spent the night in the apartment, except for the 15 or 20 minutes he was gone on the trip to Bell's grandfather's house. Hooker also said that although he knew Lane from high school, he had not seen him since 1992. Hooker did not know where Lane lived, nor did he know Chillena or Oletha Kane.

Lane, Chillena, Oletha, and their small children lived in a townhouse. By midnight September 23, 1997, Oletha was upstairs asleep. Lane and Chillena were lying on the couch. A few minutes after Chillena turned off the lights and the television, someone knocked on the front door. Chillena asked who it was and cracked open the door. The man, whom Chillena did not recognize, told her he was "D" and asked if her sister "Lee" (Oletha) was there. Chillena later identified the man as Hooker. Chillena turned on some lights as she went upstairs to wake Oletha. Oletha suggested that Chillena tell the man that he had the wrong apartment.

Chillena opened the door a crack and told the man, "She don't know you." When she tried to shut the door, he said, "Hold up, hold up" and pushed the door in. Chillena jumped back, and a man with a mask across his nose and mouth entered behind the first man. Hooker, identified as the man without the mask, asked, "Where's the money?"

Chillena screamed for Lane to get up. He had been holding Chillena's daughter. He threw the child under the coffee table. The intruders started shooting. Chillena testified that Lane and Hooker struggled. As Lane fell on Hooker, Hooker shot Lane in the back. He pushed Lane aside and got up. Oletha came downstairs, screaming. The masked man was shooting and backing out the front door. Oletha shut him out. Oletha testified that Hooker asked her, "Where's the money?" Both Chillena and Oletha said there was no money. Then, the man ran out of the apartment. Oletha slammed the door, and Chillena called 911.

Lane was shot five times, three of the bullets going all the way through his torso. The police found four .45 caliber spent cartridges in the apartment. The cartridges were fired from the same gun. The police also found one 9-mm Luger shell casing that had been fired from a different gun. About a month later, apartment maintenance found two .45 caliber bullets stuck under the carpet. Those two bullets were fired from the same weapon, but it was not known if they came from the same gun as the .45 cartridges. The guns were never found.

Chillena described the intruders as two black males. She thought one of them was 5' 7" tall, weighing 140 pounds, with a dark complexion, braided hair, a mustache, and dark clothing. She thought the other man, with a white handkerchief or ski mask over his face, was 5' 10" tall. Chillena later denied telling officers that the first man was 5' 7" tall. Oletha described the unmasked intruder as no taller than herself, or 5' 3". Officer Johnell Daniels testified that Hooker was 5' 7" tall, 140 pounds, with a goatee and mustache, and braids.

Ted Lucero, a security guard at the apartment complex, saw an Oldsmobile Cutlass and a red Cadillac pull into the complex on the night of the shooting. He said there were two black men in each car. Later, he noticed that the Oldsmobile had backed into a parking place, which was against the complex rules. The Oldsmobile was parked next to the Cadillac. He noticed that the Cadillac motor was running, but nobody was in the car. Two men were sitting in the Oldsmobile, and Lucero asked them to turn the car around. The men said they were there to pick up some girls. Both cars left a short time before the police arrived in response to the shooting. Hooker's burgundy-colored Cadillac had a lot of primer on it. Lucero did not notice any primer on the Cadillac at the apartment complex that night.

Pamela Kane, Oletha and Chillena's mother, was with Vicky Lane, the victim's mother, on September 26, 1997. Pamela was driving, and Vicky pointed out a burgundy-colored Cadillac that pulled out of the Crestwood Apartments. Pamela knew the police were looking for a burgundy-colored Cadillac.

Later that evening, Pamela and Chillena stopped at a gas station, and the same burgundy Cadillac with "primer on the back" pulled in. Two black men were in the Cadillac. They both went into the store. Pamela mentioned the car to Chillena. Pamela thought the men were staring at Chillena. Chillena thought one of the men pointed at her, but she was not sure. She wrote down the license plate number of the car, LQP 296, on her hand.

Pamela testified that Hooker was one of the men at the gas station. He came out of the store, smiled at Chillena, and spoke to her. Chillena told her mother that "that's the guy who killed Bootsie." Pamela said the two cars pulled out of the gas station in opposite directions. Chillena said the Cadillac followed them to a red light. Pamela and Chillena went to Vicky's house, where they called the police.

On September 26, 1997, Officer Lopez investigated an accident involving a small, gray Pontiac and a Cadillac. The driver of the Pontiac said she had rear-ended a maroon-colored Cadillac, license number LQP 296, when it made a sudden right turn in front of her at about 11:55 p.m. When she walked to her house to call the police, the Cadillac left the scene. At trial, she identified Hooker as the driver of the Cadillac.

Officer Lopez saw a maroon Cadillac driving around. He pursued it and confirmed that it was the car involved in the accident with the Pontiac. The car went down a dead end, behind a house, and stopped at a fence. The driver, later identified as Hooker, got out and ran. Officers found him hiding behind a shed. An officer noted that the driver's hair was in corn rows or braids.

When Hooker was arrested, the police asked him if he knew someone named Bootsie. He said he did not. When they asked Hooker if he knew Daron Lane, he told them he did. He testified that he was surprised when the officers told him he was being charged for Lane's murder.

The parties stipulated that none of Lane's blood was found on the clothes Hooker wore on September 27, 1997. They also stipulated that none of Lane's blood was found in Hooker's car or on any of Hooker's property. The police did not find Hooker's fingerprints, hair, or clothing fibers matching Hooker at the scene.

Chillena picked Hooker's picture out of a photographic lineup shortly after seeing him at the gas station. Oletha looked at a photographic lineup on the evening of September 29. She also identified Hooker. Oletha denied that she had seen Hooker's picture on television or in the newspaper. A detective had previously reviewed photos of possible suspects with Chillena and Oletha, showing them hundreds of pictures, on September 24. They had not identified anyone.

## DISCUSSION

Hooker claims that the district court erred by not instructing the jury that it was required to agree on the same underlying felony to convict Hooker of felony murder. No specific unanimity instruction was requested or given regarding the felony-murder charge.

The district court instructed the jury: "In order to return a verdict, all jurors need to agree upon a verdict. . . . It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to your individual judgment." The district court instructed the jury on felony murder and on the elements of two different felonies that would support a felony-murder conviction. Hooker contends his right to a unanimous verdict was violated by the district court's failure to give a unanimity instruction. We are not persuaded by Hooker's argument.

Generally, when no request or objection is made, we reverse only if the failure to give an instruction was clearly erroneous. See *State v. DePriest*, 258 Kan. 596, 605, 907 P.2d 868 (1995).

Our analysis of the instructions and charges leads to the conclusion that this was an alternative means case, not a multiple acts case, and, thus, no unanimity instruction was required. The district court included the following instructions in the charge to the jury:

Instruction No. 6

"In Count I, the defendant is charged with the crime of murder in the first degree. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. That the defendant killed Daron Lane;

2. That such killing was done while in the commission of or attempt to commit a felony, to-wit: aggravated burglary or robbery; and

3. That this act occurred on or about the 24th day of September, 1997, in Wyandotte County, Kansas.

"The elements of aggravated burglary are set forth in Instruction No. 7.

"The elements of robbery are as follows:

1. That the defendant intentionally took property from the person or presence of Oletha Kane, Chillena Kane and Daron Lane;

2. That the taking was by force or threat of bodily harm to Oletha Kane, Chillena Kane and Daron Lane; and

3. That this act occurred on or about the 24th day of September, 1997, in Wyandotte County, Kansas."

Instruction No. 7

"In Count II, for a further, different and second count herein, the defendant is charged with the crime of aggravated burglary. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. That the defendant knowingly entered into a building, to-wit: a residence located at 6426 Elizabeth, Kansas City, Kansas;

2. That the defendant did so without authority;

3. That the defendant did so with the intent to commit a felony, to-wit: a robbery, therein;

4. That at the time there was a human being, to-wit: Oletha Kane, Chillena Kane and Daron Lane, in the residence; and

5. That this act occurred on or about the 24th day of September, 1997, in Wyandotte County, Kansas.

"The elements of robbery are set forth in Instruction No. 6."

Hooker argues that aggravated burglary and robbery were multiple acts, where each could have constituted a felony supporting a felony-murder theory. In a multiple acts case, multiple offenses are presented to the jury, and the jury is asked to choose among those offenses. See *State v. Bolin*, 266 Kan. 18, 19, 968 P.2d 1104 (1998). The State argues that, in this case, aggravated burglary and robbery were alternative means. We have said:

" 'In an alternate means case, where a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means.' [Citations omitted.]" *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 (1994).

Hooker cites *State v. Smith*, 268 Kan. 222, 993 P.2d 1213 (1999), to support his contention that this was a multiple acts case. The *Smith* case involved conspiracy charges. The State alleged that the defendants in *Smith* committed several overt acts in furtherance

of a conspiracy to commit theft. On appeal, the *Smith* defendants essentially argued that the district court erred in failing to state a unanimity requirement regarding the specific act or acts the jury relied upon to convict the defendants of conspiracy.

We noted that the district court did not give a specific unanimity instruction about which act the jury relied upon for the conviction. However, the district court did provide a general unanimity instruction, which provided that the jury's agreement upon a verdict must be unanimous.

We noted that "[a]lthough K.S.A. 22-3421 requires a unanimous verdict, it is sufficient for the jury to find only one of the alleged overt acts in furtherance of the conspiracy to convict each defendant." 268 Kan. at 230. We pointed out that the jurors were polled by the district judge after the verdict, and each juror affirmed the guilty verdict as to the alleged acts. Thus, we found no error.

Hooker also relies on *State v. Barber*, 26 Kan. App. 2d 330, 988 P.2d 250 (1999). Barber was charged with one count of criminal possession of a firearm. The evidence showed that he possessed two different firearms at two different times during the same day. The Court of Appeals said: "The trial court's failure to [give a multiple acts instruction] prevents an objective analysis as to whether the jury unanimously agreed Barber was guilty of committing a specific criminal act." 26 Kan. App. 2d at 331.

Hooker argues that the State did not elect the underlying felony upon which it relied as the basis of the felony-murder charge; instead, it gave the jury the option to choose aggravated burglary or robbery. Also, unlike *Smith*, the jurors here were not polled.

The State contends that this was an alternative means case, *not* a multiple acts case. We agree. Unlike *Barber*, where the facts presented to the jury involved two separate acts of firearm possession, here the same facts justified both alternative means to support the felony-murder charge.

*State v. Davis*, 247 Kan. 566, 802 P.2d 541 (1990), an alternative means case, guides our resolution of this issue. Davis was convicted of first-degree felony murder. The district court instructed the jury that the felony-murder charge could be proved if Davis committed the offense of robbery, aggravated robbery, arson, or aggravated

arson, all felonies dangerous to human life. Davis argued that the court gave a clearly erroneous instruction on the elements of aggravated robbery. The jury found him guilty of aggravated robbery and aggravated arson; it also found him guilty of felony murder in the perpetration or attempt to perpetrate aggravated robbery or aggravated arson.

We held that even if the aggravated robbery instruction was erroneous, the felony-murder conviction would stand. We observed that on a separate verdict form, the jury unanimously found Davis guilty of aggravated arson, which was a legally sufficient felony to support the felony-murder conviction. 247 Kan. at 573-74.

Here, the jury was asked whether the crime of felony murder occurred during (a) the commission of or (b) an attempt to commit an inherently dangerous felony. The two types of felonies presented to the jury, aggravated burglary and robbery, were alternative means.

On a separate verdict form, the jury unanimously found Hooker guilty of aggravated burglary. Aggravated burglary is a legally sufficient felony to support a felony-murder conviction. Hooker's felony-murder conviction is affirmed.

### Arrest of Judgment

Next, Hooker argues that the district court erred by denying his K.S.A. 22-3502 post-trial motion for arrest of judgment. We disagree.

The amended information alleged that Hooker's entry into the apartment was "lawful" rather than "unlawful." One element of aggravated burglary is an unauthorized entry. K.S.A. 21-3716. Hooker argues that the failure to allege an unlawful entry was fatal to the information. Thus, he concludes that the district court did not have jurisdiction to try him for aggravated burglary.

The question of the sufficiency of an information to confer jurisdiction is a question of law over which we have unlimited review. See *State v. Wilson*, 267 Kan. 530, 534, 986 P.2d 365 (1999).

In the original information, the State alleged in Count II:

"[O]n or about the 24th day of September, 1997, one Terry L. Hooker, Jr., did *unlawfully*, knowingly and without authority enter into a building, to-wit: resi-

dence located at 6426 Elizabeth, in which there was a human being, to-wit: . . . ." (Emphasis added.)

In denying Hooker's motion to arrest judgment, the district court found: "Unintentional or typographical defects in the charging document are not in and of itself sufficient to prejudice the substantial rights of the defendant."

Hooker relies on *State v. Hall*, 246 Kan. 728, 793 P.2d 737 (1990). *Hall* instructed on the method of asserting that either an information does not charge a crime or that the district court has no jurisdiction of the crime charged. The procedure is to file a K.S.A. 22-3502 motion for arrest of judgment. Hooker did so. We have established a pre-*Hall* standard and a post-*Hall* standard of review. 246 Kan. at 764-65. Because Hooker filed a motion for arrest of judgment, the district court was to test the sufficiency of the information by the pre-*Hall* standard, focusing on technical considerations, rather than practical considerations. See 246 Kan. 728, Syl. ¶ 13. In *Hall*, the failure of the complaint to allege that Hall took control of the cattle with the intent to "permanently" deprive the owner of possession rendered the complaint fatally defective. Hall's theft conviction, under K.S.A. 21-3701, was reversed. 246 Kan. at 747.

Hooker correctly asserts that when charging a criminal offense, the State must set out the essential elements of the crime. *State v. Sanford*, 250 Kan. 592, 601, 830 P.2d 14 (1992). In *State v. Wright*, 221 Kan. 132, 557 P.2d 1267 (1976), Wright complained of a typographical error in the information. The statutory reference for the aggravated weapons charge was written K.S.A. 21-4204, instead of K.S.A. 21-4202. The incorrect citation was repeated in the journal entry. The information included the proper statutory language. We noted that Wright did not contend that he was misled or prejudiced. He based his contention solely on the technical error.

We found that Wright's contention lacked merit, noting that section (2) of K.S.A. 22-3201 (Weeks), provided: " 'Error in the citation or its omission shall be not ground for dismissal of the complaint, information or indictment or for reversal of a conviction if the error or omission did not prejudice the defendant.' " *Wright*, 221 Kan. at 140.

The State here observes that the original information had no typographical error and that Hooker was bound over for trial on the original information. The State filed the amended information for the sole purpose of endorsing additional witnesses. According to the State, this is not a situation where an essential element of the crime was omitted. Instead, a typographical error appeared in the amended information.

The case of *State v. Christiansen*, 258 Kan. 465, 904 P.2d 968 (1995), is instructive. A jury found Christiansen guilty of the unlawful possession of wildlife. Christiansen argued that the complaint was defective and, therefore, his conviction should be set aside. After his trial, he filed a motion for arrest of judgment and the district court set aside his conviction. The State appealed.

Christiansen was charged with a violation of K.S.A. 32-1002(a)(2), which said:

"(a) Unless and except as permitted by law or rule and regulations adopted by the secretary in accordance with K.S.A. 32-805 and amendments thereto, it is unlawful for any person to: . . . (2) possess, any wildlife, dead or alive, at any time or in any number, in this state."

The complaint alleged that Christiansen "unlawfully and intentionally" possessed wildlife, in violation of the statute. Christiansen argued in his motion for arrest of judgment that the complaint was fatally defective because it failed to include language saying that the possession was not authorized. The State argued that the crime was unlawful possession and that the term "unlawfully" in the complaint was sufficient.

Christiansen relied upon *Hall* for the proposition that the word "unlawful" is insufficient to correct a jurisdictional defect. In *Hall*, the fact that the information alleged Hall acted "unlawfully" and exerted "unauthorized" control was insufficient to correct the omission of the word "permanently." *Hall*, 246 Kan. at 746.

In *Christiansen*, we pointed out that *Hall* did not support Christiansen's claim. We said that a person may unlawfully obtain or exert unauthorized control over property without intending to permanently deprive. Thus, the information in *Hall* was defective. Regarding Christiansen's claim, we said: "*Hall* has no application to

cases such as the one before us, for in this case, *if the defendant unlawfully possessed wildlife, he did so without authorization, and if the defendant had authorization, he did not unlawfully possess wildlife.*" (Emphasis added.) 258 Kan. at 470-71. A commonsense reading of the statute showed that possession of a deer was either unlawful because it was unauthorized or lawful because it was authorized. We concluded that the complaint in Christiansen's case was not jurisdictionally defective. 258 Kan. at 471.

Here, the amended information alleged that Hooker entered the building "lawfully, knowingly, and without authority." K.S.A. 21-3716 (aggravated burglary) requires that the accused entered the building "knowingly and without authority." It is inherent in the language of the statute that such action in violation of the statute is unlawful. Under the reasoning of *Christiansen*, where we used a pre-*Hall* analysis, a reading of K.S.A. 21-3716 shows that the entry into the building was either unlawful because it was unauthorized and done knowingly or it was lawful because it was authorized. The information, because it alleged that the entry into the apartment was unauthorized, was not jurisdictionally defective. Hooker was adequately apprised of the offense with which he was charged. The district court did not err in denying Hooker's motion for arrest of judgment.

### Exclusion of Evidence

Next, Hooker contends that the district court erred by excluding evidence that two other people had threatened to harm Lane, the victim. Hooker asserts that his Sixth and Fourteenth Amendment rights to a fair trial have been violated. We disagree. The admission or exclusion of evidence lies within the sound discretion of the district court. On appellate review, we examine whether the district court abused its discretion. See *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999).

Hooker's defense was that he did not commit the murder. To support his theory, he attacked the identification of eyewitnesses and presented alibi witnesses at trial. Before trial, the State filed a motion in limine, requesting that the court prevent Hooker from "[e]liciting any theory as to any other specific 'suspects,' unless said

testimony is based upon facts known by the witness and not based upon innuendo, conjecture, speculation or hearsay evidence." At the hearing on the motion, the district court noted that if the defense had "facts" or "evidence" that another person was involved in the homicide, Hooker would be allowed to bring that information before the jury.

Hooker wanted to rely upon what he recognized as hearsay evidence based upon rumors. The district court advised that Hooker would be permitted to present evidence and facts regarding other suspects, but such evidence would not be permitted if it was based upon innuendo, conjecture, speculation, or hearsay.

During trial, defense counsel wanted to ask witness Lance Guess if Guess told police that another individual, Earl Watson, Jr., had threatened Lane. Apparently this assertion was written in a police report. The prosecutor objected on the basis of relevance, noting that there was no indication or showing that Watson was involved in this case. The district court disallowed the question. Hooker's counsel also proffered that, but for the motion in limine, the victim's mother would testify that before the shooting she had received threats from Dwayne Hooks against her son. The judge denied the request, saying, "I'm not going to let in any innuendo or rumor or speculation about someone else [*sic*] might have, could have, had reason to kill the victim in this case."

We have considered similar "someone else did it" claims in past cases. In *State v. Valdez*, 266 Kan. 774, 977 P.2d 242 (1999), Valdez wanted to show that another person may have committed the murder. Valdez proffered evidence that the police had received an anonymous call from an individual who said he had talked to a man named Francisco Herrera. Herrera had told the caller that David Ramirez, the man that the victim purportedly threatened to report to the police regarding drug crimes, was involved in the murder.

Valdez also proffered that Monica Lucero, an ex-girlfriend of Ramirez, lived in the area where the victim's abandoned car was found. Valdez could not locate Herrera or Lucero, so the district court excluded the anonymous caller's statements. At the close of Valdez' evidence, Lucero appeared at trial. The defense proffered her testimony outside of the jury's presence. The court found that

Lucero's proffered testimony did not establish a nexus between Ramirez and the death of the victim. On appeal, we said: "The accused does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence." We found that the district court did not err in excluding the anonymous caller's unsubstantiated tips. 266 Kan. at 799.

Hooker argues that his case is distinguishable from *Valdez*. He contends that, here, the witnesses to the threats were both present and testified at trial. He acknowledges that the State had direct evidence, namely eyewitness identification. We have found that when the State's case relies heavily on circumstantial evidence, it is error to exclude circumstantial evidence that someone else committed the crime when the defendant's proffered evidence includes the timely placement of another person at the murder scene. See *State v. Hamons*, 248 Kan. 51, Syl. ¶ 2, 60-61, 805 P.2d 6 (1991) (finding an abuse of discretion to exclude evidence that another person had threatened the victim and was at the scene of the murder near the time of the murder where there was no eyewitness identification, but concluding that the error was harmless).

Conversely, we have been stricter on admission when the State relies on direct evidence, such as eyewitness identification. Circumstantial evidence that someone other than the defendant committed the crime is irrelevant in the absence of other evidence to connect that other person with the crime charged. *State v. Bornholdt*, 261 Kan. 644, Syl. ¶ 19, 932 P.2d 964 (1997). We have found no abuse of discretion in excluding such evidence in cases involving eyewitness identification testimony. *E.g., State v. Brown*, 230 Kan. 499, 500, 638 P.2d 912 (1982); *State v. Henderson*, 205 Kan. 231, 239-40, 468 P.2d 136 (1970); *State v. Potts*, 205 Kan. 42, 44, 468 P.2d 74 (1970).

Hooker failed to show that the two people who allegedly made threats were involved in Lane's death. We have said:

"There is a general rule supported by numerous decisions that evidence of the motive of one other than the defendant to commit the crime will be excluded where there is no other proof in the case which tends to connect such other person

with the offense with which the defendant is charged. [Citations omitted.]" *State v. Neff*, 169 Kan. 116, 123, 218 P.2d 248, *cert. denied* 340 U.S. 866 (1950).

Hooker attacks the credibility of the eyewitness testimony, emphasizing contradictions or discrepancies. He asserts that eyewitness identification is "notoriously unreliable in general and particularly questionable in this case," citing *Simmons v. United States*, 390 U.S. 377, 383, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968), and *United States v. Wade*, 388 U.S. 218, 228-29, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967).

We acknowledge that eyewitness identification testimony carries some danger that the witness may make an incorrect identification. However, we do not reweigh the evidence or pass on the credibility of witnesses. *State v. Orr*, 262 Kan. 312, 322, 940 P.2d 42 (1997). The jury was instructed to determine the weight and credibility to be given to the testimony of each witness. The district court also gave the Pattern Instructions for Kansas Crim. 3d 52.20 cautionary instruction on eyewitness identification testimony (factors for consideration on weighing the reliability of eyewitness identification testimony). Hooker failed to provide evidence to connect the two other persons with Lane's death. The district court did not abuse its discretion by excluding the evidence.

## Closing Argument

Hooker contends for his final issue that the prosecutor during closing arguments committed misconduct requiring reversal. Hooker acknowledges that he did not object to the prosecutor's closing comments. Generally, reversible error cannot be based upon misconduct by the prosecutor during closing argument where no contemporaneous objection is lodged. *State v. Finley*, 268 Kan. 557, 571, 998 P.2d 95 (2000). However, "if the prosecutor's statements rise to the level of violating a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection." 268 Kan. at 571.

Our analysis of the effect of a prosecutor's allegedly improper remarks in closing argument is a two-step process: (1) Were the remarks outside the considerable latitude the prosecutor is allowed

in discussing the evidence? and (2) Were the remarks so gross and flagrant as to prejudice the jury against the defendant and to deny the defendant a fair trial? 268 Kan. at 571-72; *State v. Miller*, 268 Kan. 517, 520, 997 P.2d 90 (2000).

During closing arguments, the prosecutor said:

"And do you remember what Oletha Kane said. She said she looked at this guy. She looked at his face. She looked in his eyes. And, folks, the eyes of that man sitting right over there are cold-blooded killing eyes.

. . . .

"And he [defense counsel] talks to you about a tragedy, that Daron Lane's killing was a tragedy and that it would be a tragedy to convict the defendant. Well, even more so, folks, it would be more of a tragedy to let a guilty man walk free out of this courtroom.

"Don't do that. Don't let Daron Lake die in vain. Don't let his murder go unanswered. Hold the person accountable who committed this heinous, unspeakable, unnecessary act. And that man is seated right over there. Terry Hooker."

Hooker argues that the prosecutor wrongly expressed her personal opinion that Hooker was guilty and contends that these statements gave the jury the impression that they had an obligation to Kansans to convict the defendant. While the prosecution is given wide latitude in the language and presentation of closing arguments in a criminal trial, " '[n]o rule governing oral argument is more fundamental than that requiring counsel to confine remarks to matters in evidence.' . . . [Citation omitted.]" *State v. Heath*, 264 Kan. 557, 583, 957 P.2d 449 (1998). As Hooker correctly points out, it is improper for the prosecutor to express his or her personal belief as to the defendant's guilt. See *State v. Henderson*, 226 Kan. 726, 737, 603 P.2d 613 (1979); *State v. Gray*, 25 Kan. App. 2d 83, 88, 958 P.2d 37 (1998).

Here, the prosecutor's remark about Hooker's "cold-blooded killing eyes" was improper, but it does not rise to the level of the remarks in *Gray* and *Henderson*.

We have also held that it is improper to refer to the effect of a verdict on the community or to appeal to the interest of the jurors as members of the community. *State v. Hays*, 256 Kan. 48, 67-68, 883 P.2d 1093 (1994) (finding that prosecutor's statement was improper, but the statement was not so gross and flagrant as to prejudice the jury against Hays). See *Finley*, 268 Kan. at 571-72.

The prosecutor's "tragedy" reference rebutted the following remarks by defense counsel:

"Would you base the most important decision of your life upon the evidence you've heard here? No physical evidence, the varying testimonies of the witnesses. What happened here, it was a tragedy. Don't make a second tragedy happen by convicting an innocent man."

The prosecutor's remarks did not convey an obligation to the community or to citizens to convict Hooker. The jury was instructed that the statements, arguments, and remarks of counsel were not evidence. The prosecutor's remarks were not so gross and flagrant as to prejudice Hooker and deny him a fair trial.

Affirmed.